[No. S041711. Sept. 1, 1995.]

BARBARA SMILEY, Plaintiff and Appellant, v.
CITIBANK (SOUTH DAKOTA) N.A., Defendant and Respondent.

---

---

**COUNSEL**

Chimicles, Burt & Jacobsen, Chimicles, Jacobsen & Tikellis, Nicholas E. Chimicles, Michael D. Donovan, Pamela P. Bond, Euguene Mikolajczyk and Patrick J. Grannan for Plaintiff and Appellant.

Kennedy P. Richardson, Albert Lee, Kathleen Keest, Adele P. Kimmel, Chavez & Gertler, Mark A. Chavez, Malakoff, Doyle & Finberg, Michael P. Malakoff, Sturdevant & Sturdevant, James C. Sturdevant and Kim E. Card as Amici Curiae on behalf of Plaintiff and Appellant.

Shearman & Sterling, William M. Burke, Richard B. Kendall and Michael H., Strub, Jr., for Defendant and Respondent.

Charles J. Stevens, United States Attorney General, Joseph E. Maloney, Julie L. Williams, L. Robert Griffin, Horace G. Sneed, Christopher Chenoweth, John J. Gill, Robert McKew, Steven I. Zeisel, Sheppard, Mullin, Richter & Hampton, John D. Berchild, Jr., Charles H. MacNab, Jr., Landels, Ripley & Diamond, Frederick M. Pownall, Sanford Svetcov, Morrison & Foerster, Robert S. Stern, Lauren T. Nguyen, William Alsup, Robert Stern, James Huizinga, McCutchen, Doyle, Brown & Enersen, Palmer Brown Madden, Grant Guerra, Wolf, Block, Schorr & Solis-Cohen, Ballard, Spahr, Andrews & Ingersoll, Alan S. Kaplinsky, Jeffrey S. Saltz and Burt M. Rublin as Amici Curiae on behalf of Defendant and Respondent.

---

**OPINION**

**MOSK, Acting C. J.**—We granted review in this cause—which is one of numerous similar matters brought in federal and state courts throughout the

nation—in order to consider the meaning and effect of section 30 of the National Bank Act of 1864. In pertinent part and without substantive change, the provision has been incorporated in section 5197 of the Revised Statutes of 1878, and has been codified in section 85 of title 12 of the United States Code (hereafter section 85), which is its common designation. As relevant here, it provides that a national banking association, or, more simply, a national bank, "may take, receive, reserve, and charge on any loan . . . *interest* at the rate allowed by the laws of the state . . . where the bank is located . . . ." (Italics added.) Our question is, "May the term 'interest' be construed to cover late payment fees?" Our answer is, "Yes, if such fees are allowed by a national bank's home state."

I

Plaintiff Barbara Smiley (hereafter Smiley) filed a complaint in the Superior Court of Los Angeles County against defendant Citibank (South Dakota) N.A. (hereafter Citibank). Smiley purported to proceed on behalf of herself and all others similarly situated—specifically, the class of persons "who held or currently hold a Citibank credit card . . . while they were residents of California and while they maintained a California billing address, and who have contracted for or been charged a late charge on such credit card account." She alleged facts to the following effect: she was a resident of Los Angeles County; Citibank was a national bank chartered by the Comptroller of the Currency with its only address in Sioux Falls, South Dakota, and consequently located solely in that state; it issued credit cards under the "Visa" and "MasterCard" service marks; she held a Citibank "Preferred" Visa credit card and had held a Citibank MasterCard credit card; as a condition of the extension of credit, Citibank "charges a late charge of up to $15.00 upon California consumers who use its credit cards, irrespective of the outstanding balance or amount owing on the credit card in question," when they do not timely make a minimum payment; she had been charged late payment fees by Citibank on both her Preferred Visa and her Master-Card credit card accounts. On the basis of such allegations, she attempted to state various causes of actions arising under California law, including statutes and common law, going ultimately to the amount of the late payment fees in question, and sought various forms of relief.

Citibank filed in the United States District Court for the Central District of California a notice of removal of Smiley's action from state court to federal—its petition for removal. The sole ground on which it relied was diversity of citizenship—so-called "diversity jurisdiction"—under of section 1332(a)(1) of title 28 of the United States Code, which requires not only that the parties are "citizens of different States" but also that the "matter in controversy exceeds the sum or value of $50,000 . . . ."

Subsequently, Citibank filed an answer in federal district court. One of the affirmative defenses was to the effect that Smiley's complaint failed to state facts sufficient to constitute a cause of action against Citibank: Smiley's pleading, which was based on California law bearing on the amount of late payment fees, was without support because that law was preempted as to Citibank through section 85 by operation of the supremacy clause.

Smiley then filed in federal district court a motion to remand the action to the superior court. Her ground was that diversity jurisdiction was lacking because, properly considered, the matter in controversy did not exceed $50,000.

Citibank in turn filed in federal district court a motion requesting leave to amend its petition for removal. It sought to add as a ground that the action, as a result of preemption, arose "under the Constitution, treaties or laws of the United States"—so-called "federal question jurisdiction"—under section 1441(b) of title 28 of the United States Code.

In due course, the federal district court filed an order denying Citibank's motion requesting leave to amend its petition for removal and granting Smiley's motion to remand. (*Smiley* v. *Citibank (South Dakota), N.A.* (C.D.Cal. 1993) 863 F.Supp. 1156.) It denied Citibank's motion as untimely, although it noted that, "[g]iven the strength of Citibank's preemption argument and the strong public interest in developing a uniform and consistent body of federal banking law, [it] understands Citibank's desire to adjudicate this dispute in federal court." (*Id.* at p. 1162.) It granted Smiley's motion, accepting as meritorious her claim that diversity jurisdiction was lacking because, properly considered, the matter in controversy did not exceed $50,000.

Citibank then filed in the superior court a common law motion for judgment on the pleadings. Its ground was to the effect that Smiley's complaint failed to state facts sufficient to constitute a cause of action against it as a result of preemption through section 85. Smiley filed opposition. By leave of the court, the United States filed a statement of interest on behalf of the Comptroller of the Currency as amicus curiae in support of Citibank's position.

The superior court caused entry of a minute order wherein it denied Citibank's motion.

Citibank proceeded to file a petition for writ of mandate in the Court of Appeal, Second Appellate District, seeking to compel the superior court to

vacate its order denying its motion and to enter a new and different order granting its request.

After soliciting and receiving opposition from Smiley, the Court of Appeal caused issuance of an alternate writ of mandate, compelling the superior court either to vacate its earlier order denying Citibank's motion and to grant its request or to show cause why, among other things, it should not be required to do so by peremptory writ.

Complying with the Court of Appeal's alternative writ of mandate, the superior court caused entry of a minute order. In that order, it vacated its earlier order denying Citibank's motion and proceeded to grant its request.

Thereupon, Smiley filed a notice of appeal in the superior court. That same day, the Court of Appeal discharged the alternative writ of mandate and dismissed Citibank's petition as moot.

Subsequently, the superior court filed an order, with reasons stated, granting Citibank's motion, and in accordance therewith filed a judgment of dismissal.

On appeal, the Court of Appeal affirmed.[1] Agreeing with the superior court on preemption through section 85, a majority of two justices concluded that its order granting Citibank's motion should be sustained. Disagreeing, a single dissenting justice would have held to the contrary. The majority relied in large part on *Greenwood Trust Co.* v. *Com. of Mass.* (1st Cir. 1992) 971 F.2d 818 (hereafter sometimes *Greenwood Trust*), which construes section 85 in the course of construing a provision evidently modeled on its language, viz., section 521 of the Depository Institutions and Monetary Control Act of 1980 (hereafter DIDA), codified in section 1831d(a) of title 12 of the United States Code, which covers federally insured state banks and federally insured branches of foreign banks. They also relied on the position taken by the Comptroller of the Currency. For his part, the dissenter criticized the *Greenwood Trust* court's reasoning and the Comptroller of the Currency's views, the former at length and in detail and the latter less so.

On Smiley's petition, we granted review. We now affirm.

---

[1]The Court of Appeal impliedly treated Smiley's appeal as taken from the superior court's judgment—which was appealable (see *Campbell* v. *Jewish Com. for P. Service* (1954) 125 Cal.App.2d 771, 773 [271 P.2d 185] (per Peters, P. J.))—and not from its order granting Citibank's motion—which was not (*ibid.*).

## II

Smiley's sole contention is that Court of Appeal erred in its conclusion upholding the superior court's order granting Citibank's common law motion for judgment on the pleadings.[2]

## A

█ In ruling on a common law motion for judgment on the pleadings made by a defendant, a trial court determines what has been called a pure question of law (*Donohue* v. *State of California* (1986) 178 Cal.App.3d 795, 802 [224 Cal.Rptr. 57]; *Goodley* v. *Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389, 392-393 [133 Cal.Rptr. 83]), but what is in fact a mixed question of law and fact that is predominantly legal: does the plaintiff's complaint state facts sufficient to constitute a cause of action against the defendant? (*Donohue* v.

---

[2]Citibank requests us to take judicial notice of matter reflected in several items, comprising the following: certain decisions of federal, sister-state, and English courts; certain documents from the Office of the Comptroller of the Currency and other federal administrative agencies; certain submissions filed in the courts of California and a sister state by the United States on behalf of the Comptroller; and certain documents from Citibank relating to the terms of its "Preferred" credit card accounts in the general period pertinent here. We do so. We are either required or permitted to take judicial notice (Evid. Code, § 459, subd. (a)) with respect to all such matter. Specifically, we are required to take judicial notice of decisions constituting the law of the United States. (*Id.*, § 451, subd. (a).) We are permitted to take judicial notice of the following: decisions constituting the law of any state of the United States (*id.*, § 452, subd. (a)); the law of any foreign nation (*id.*, § 452, subd. (f)); official acts of the executive departments of the United States (*id.*, § 452, subd. (c)); records of any court of record of any state of the United States (*id.*, § 452, subd. (d)); and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (*id.*, § 452, subd. (h)). Smiley argues against judicial notice of some of the matter in question, but does so unpersuasively.

In conjunction with a brief filed as amicus curiae supporting Citibank's position, Chase Manhattan Bank, N.A., requests us to take judicial notice of matter reflected in several items, comprising certain decisions of sister-state courts and certain documents from federal administrative agencies. We do so. As stated above, we are permitted to take judicial notice with respect to all such matter.

Smiley effectively moves us to strike a brief filed by the Comptroller of the Currency as amicus curiae supporting Citibank's position. She argues that, by appearing under his own name, the Comptroller has acted outside his authority under the laws of the United States. He has not. (12 U.S.C. § 93(d) [*sic:* the subsection should be designated "(e)"].) Accordingly, we deny her request.

We note in passing that, during the course of this action, section 438 was added to the Code of Civil Procedure dealing with motions for judgment on the pleadings, and section 4001 was added to the Financial Code dealing with late payment fees in consumer credit agreements. Neither Smiley nor Citibank has raised any claim that either provision is pertinent to the conduct of the proceedings or to the outcome thereof.

We also note in passing that Smiley asserts that the superior court's order, with reasons stated, granting Citibank's common law motion for judgment on the pleadings is "not reflective of the actual proceedings or pleadings in the case." So far as appears, it is.

*State of California, supra,* 178 Cal.App.3d at p. 802; *Goodley* v. *Wank & Wank, Inc., supra,* 62 Cal.App.3d at pp. 392-393.) In so doing, the trial court generally confines itself to the complaint and accepts as true all material facts alleged therein. (E.g., *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 412 [62 Cal.Rptr. 401, 432 P.2d 3].) As appropriate, however, it may extend its consideration to matters that are subject to judicial notice. (E.g., *ibid.*) In this, it performs essentially the same task that it would undertake in ruling on a general demurrer. That is not surprising. A common law motion for judgment on the pleadings "ha[s] the purpose and effect of a general demurrer." (*Kortmeyer* v. *California Ins. Guarantee Assn.* (1992) 9 Cal.App.4th 1285, 1293 [12 Cal.Rptr.2d 71]; see *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks., supra,* 67 Cal.2d at pp. 411-412.)

An appellate court independently reviews a trial court's order on such a motion. (See *Lumbermens Mut. Cas. Co.* v. *Vaughan* (1988) 199 Cal.App.3d 171, 178-179 [244 Cal.Rptr. 567]; *Crain* v. *Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 512 [123 Cal.Rptr. 419]; cf. 1 Childress & Davis, Federal Standards of Review (2d ed. 1992) § 5.01, p. 5-6 [stating that a federal district court's order on the analogous motion for judgment on the pleadings under rule 12(c) of the Federal Rules of Civil Procedure (28 U.S.C.) is subject to "review . . . de novo"].) That is certainly proper. Independent review is called for when the underlying determination involves a purely legal question or a predominantly legal mixed question. (E.g., *Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) As stated, the determination here is such.

Finally, we as the court of last resort independently review a decision by a lower appellate court concerning a trial court's order on a motion of this sort. Indeed, we so review *all* such decisions. We have no need to defer, because we can ourselves conduct the same analysis. In fact, we have need *not* to defer, in order to be free to further the uniform articulation and application of the law within our jurisdiction.

B

The question that is central to our analysis involves section 85—which, as stated above, provides that a national bank "may take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located"—and the preemption of California law. It is clear that national banks are authorized to conduct credit card programs, to issue credit cards to holders, and to provide money thereunder to such

persons and to others on their behalf in exchange for goods or services. (12 C.F.R. § 7.7378 (1995); see 12 U.S.C. § 24 (Seventh) [authorizing national banks to "loan[] money on personal security"].) It is also clear that, in thus providing money under credit cards, a national bank makes "loans" within the meaning of section 85.

As to preemption generally, the law is as follows.

The supremacy clause declares, in pertinent part, that "Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.)

■ Since the decision in *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 427 [4 L.Ed. 579, 606], "it has been settled that state law that conflicts with federal law is 'without effect.'" (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 422, 112 S.Ct. 2608, 2617].)

Whether federal law preempts state law "fundamentally is a question of congressional intent . . . ." (*English* v. *General Electric Co.* (1990) 496 U.S. 72, 79 [110 L.Ed.2d 65, 74, 110 S.Ct. 2270]; accord, *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617]; *Mangini* v. *R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1066 [31 Cal.Rptr.2d 358, 875 P.2d 73]; see, e.g., *N.Y. Conference of Blue Cross* v. *Travelers Ins.* (1995) __ U.S. __, __-__ [131 L.Ed.2d 695, 704-706, 115 S.Ct. 1671, 1676-1677].)

Such preemption is found in "three circumstances." (*English* v. *General Electric Co.*, *supra*, 496 U.S. at p. 78 [110 L.Ed.2d at p. 74].) "First, Congress can define explicitly the extent to which its enactments pre-empt state law." (*Ibid.*; accord, *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617].) "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." (*English* v. *General Electric Co.*, *supra*, 496 U.S. at p. 79 [110 L.Ed.2d at p. 74]; accord, *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617].) "Finally, state law is pre-empted to the extent that it actually conflicts with federal law." (*English* v. *General Electric Co.*, *supra*, 496 U.S. at p. 79 [110 L.Ed.2d

at p. 74]; accord, *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617].)[3]

■ "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617].) That appears to be true of preemption generally. (See *ibid.*) It is certainly true of "field preemption" specifically. (*English* v. *General Electric Co.*, *supra*, 496 U.S. at p. 79 [110 L.Ed.2d at p. 74].) The " 'historic police powers of the States' " extend to consumer protection. (E.g., *California* v. *ARC America Corp.* (1989) 490 U.S. 93, 101 [104 L.Ed.2d 86, 94, 109 S.Ct. 1661].) They extend as well to banking. (See *National State Bank, Elizabeth, N.J.* v. *Long* (3d Cir. 1980) 630 F.2d 981, 985-986 [57 A.L.R.Fed. 308]; cf. *Lewis* v. *BT Investment Managers, Inc.* (1980) 447 U.S. 27, 38 [64 L.Ed.2d 702, 713, 100 S.Ct. 2009] [under the commerce clause: "both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern"].) It must be recognized, however, that federal authority has also affected banking since before enactment of the National Bank Act in 1864. (*National State Bank, Elizabeth, N.J.* v. *Long*, *supra*, 630 F.2d at p. 985.)[4]

Turning to the case at bar, we must be precise concerning the question of preemption.

■ The issue is not the *existence* of preemption under section 85. In *Marquette Nat. Bank* v. *First of Omaha Corp.* (1978) 439 U.S. 299 [58 L.Ed.2d 534, 99 S.Ct. 540] (hereafter sometimes *Marquette*), which happens to have concerned credit card programs at national banks, the United States Supreme Court held that section 85 does in fact preempt state law within its coverage, apparently under the rubric of "conflict preemption." Looking to

---

[3]The "three categories" of preemption referred to in the text should not be taken to be "rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." (*English* v. *General Electric Co.*, *supra*, 496 U.S. at pp. 79-80, fn. 5 [110 L.Ed.2d at p. 75]; accord, *Gade* v. *National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 104, fn. 2 [120 L.Ed.2d 73, 88, 112 S.Ct. 2374, 2386].)

[4]In his dissenting opinion, Justice Arabian takes the position that the standard for preemption applicable here "requires the invalidation of a state law *only* where it ' "incapacitates the [national] banks from discharging their duties to the government . . . ." ' " (Dis. opn. of Arabian, J., *post*, at p. 175, italics in original.) That is not the case. For his test, he quotes *McClellan* v. *Chipman* (1896) 164 U.S. 347, 357 [41 L.Ed. 461, 465, 17 S.Ct. 85]. A century of law, however, has intervened. (See fn. 5, *post.*)

section 30 of the National Bank Act, the source of section 85, the *Marquette* court held that the latter authorizes a national bank to demand and collect interest on any loan, even an interstate loan, at the rate permitted under its home state's law—even an unlimited rate (*Hiatt* v. *San Francisco National Bank* (9th Cir. 1966) 361 F.2d 504, 506-507; see *Daggs* v. *Phoenix National Bank* (1900) 177 U.S. 549, 555-556 [44 L.Ed. 882, 884-885, 20 S.Ct. 732] [dealing with section 30 of the National Bank Act])—notwithstanding the law of any other state. (*Marquette Nat. Bank* v. *First of Omaha Corp., supra,* 439 U.S. at pp. 307-319 [58 L.Ed.2d at pp. 541-548].) In short, it concluded that the provision empowers such a bank to "export" its home state's interest rate. In reaching its result, it addressed an argument that the " 'exportation' of interest rates . . . will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. [Citation.] This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." (*Id.* at pp. 318-319 [58 L.Ed.2d at p. 548], fn. omitted.) In so many words, the *Marquette* court read section 85 as a choice-of-law provision, fixing the law of the national bank's home state relative to interest rates as the rule governing all loans, even interstate loans, notwithstanding the law of any other state. Section 85 thereby entrusts the question of the lawfulness of a national bank's interest rates to its home state and to its home state alone.[5]

■ The issue, to return to our theme, is not the *existence* of preemption under section 85, but rather its *scope*. Its resolution will depend on the meaning that the term "interest" bears within the provision.

We cannot find the meaning of the term "interest" in section 85 itself. The provision simply does not define the word. (E.g., *Ament* v. *PNC Nat. Bank* (W.D.Pa. 1994) 849 F.Supp. 1015, 1019; *Watson* v. *First Union Nat. Bank of South Carolina* (D.S.C. 1993) 837 F.Supp. 146, 150; *Goehl* v. *Mellon Bank (DE)* (E.D.Pa. 1993) 825 F.Supp. 1239, 1241; *Nelson* v. *Citibank (South Dakota) N.A.* (D.Minn. 1992) 794 F.Supp. 312, 317.)

Let us then proceed to consider the source of section 85, which is section 30 of the National Bank Act.

---

[5]We note in passing that, in its preemption analysis, *Marquette* says not a word about whether section 85 " 'incapacitates the [national] banks from discharging their duties to the government' " (*McClellan* v. *Chipman, supra,* 164 U.S. at p. 357 [41 L.Ed. at p. 465], quoting *National Bank* v. *Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [19 L.Ed. 701,703])—as it plainly does not. *Marquette* thus precludes Justice Arabian's standard for preemption. (See fn. 4, *ante.*)

What we now call the National Bank Act was passed by Congress in 1864, in the midst of the Civil War, under the title, "An Act to provide a National Currency, secured by a Pledge of United States Bonds, and to provide for the Circulation and Redemption thereof." (Act of June 3, 1864, ch. 106, 13 Stat. 99.) It substantially repealed (*id.*, ch. 106, § 62, 13 Stat. 118) and superseded (*id.*, ch. 106, §§ 1-61, 63-64, 13 Stat. 99-118) a statute enacted in 1863, under the title, "An Act to provide a national Currency, secured by a Pledge of United States Stocks, and to provide for the Circulation and Redemption thereof" (Act of Feb. 25, 1863, ch. 58, 12 Stat. 665). Its title was altered in 1874 to "the national-bank act." (Act of June 20, 1874, ch. 343, § 1, 18 Stat. 123.)

In *Marquette*, the United States Supreme Court declared that the purpose of the National Bank Act was "to facilitate . . . a 'national banking system[]' " (*Marquette Nat. Bank* v. *First of Omaha Corp.*, *supra*, 439 U.S. at p. 315 [58 L.Ed.2d at p. 546])—"in part," as it had earlier stated in *Tiffany* v. *National Bank of Missouri* (1874) 85 U.S. (18 Wall.) 409, 413 [21 L.Ed. 862, 864] (hereafter sometimes *Tiffany*), to "provid[e] a currency for the whole country, and in part to create a market for the loans of the General government." Within this system, "[n]ational banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States." (*Davis* v. *Elmira Savings Bank* (1896) 161 U.S. 275, 283 [40 L.Ed. 700, 701, 16 S.Ct. 502]; accord, *Farmers'*, *etc. Nat. Bank* v. *Dearing* (1875) 91 U.S. (1 Otto) 29, 33-34 [23 L.Ed. 196, 198-199].)

In *Tiffany*, the United States Supreme Court declared that the purpose of section 30 of the National Bank Act, as it later stated in *Marquette*, was to grant national banks " 'most favored lender' status" in their home states. (*Marquette Nat. Bank* v. *First of Omaha Corp.*, *supra*, 439 U.S. at p. 314, fn. 26 [58 L.Ed.2d at p. 545].) In *Tiffany*'s words, the provision "was intended to give [national banks] a firm footing in the different States where they might be located. It was expected they would come into competition with State banks"—and others—"and it was intended to give them at least equal advantages in such competition." (*Tiffany* v. *National Bank of Missouri*, *supra*, 85 U.S. (18 Wall.) at p. 412 [21 L.Ed. at p. 863].) "Most favored lender" status "was considered indispensable to protect them against possible unfriendly State legislation. Obviously, if State statutes should allow to their banks . . . a rate of interest greater than the ordinary rate allowed to natural persons, National banking associations could not compete with them, unless allowed the same. On the other hand, if such associations were restricted to the rates allowed by the statutes of the State to banks which might be authorized by the State laws, unfriendly legislation might make

their existence in the State impossible. A rate of interest might be prescribed so low that banking could not be carried on, except at a certain loss. The only mode of guarding against such contingencies was that which, we think, Congress adopted. It was to allow to National associations the [highest] rate allowed by the State . . . . This construction accords with the purpose of Congress, and carries it out. It accords with the spirit of all the legislation of Congress. National banks have been National favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the States, or to ruinous competition with State banks"—or others. (*Id.* at pp. 412-413 [21 L.Ed. at pp. 863-864].) "In harmony with this policy is the construction we think should be given to the thirtieth section of the act of Congress we have been considering. It gives advantages to National banks over their State competitors. It allows such banks to charge such interest as" what was later called the state's "most favored lender." (*Id.* at p. 413 [21 L.Ed. at p. 864].) Thus, the purpose of section 30 of the National Bank Act was to grant national banks "most favored lender" status in their home states—to protect them from possible unfriendly state legislation, whether such legislation was unfriendly in intent or effect. "The mechanism of referring to state law"—to take words written in a different context but nevertheless fitting here—"is simply one designed to implement that . . . intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation." (*First National Bank* v. *Dickinson* (1969) 396 U.S. 122, 133 [24 L.Ed.2d 312, 319-320, 90 S.Ct. 337].)[6]

With this in mind, we can undertake to construe the term "interest" in section 30 of the National Bank Act.

Looking at the National Bank Act itself, we find no express definition of the term "interest" in section 30. The provision itself does not offer a meaning. Neither does any other.

Surveying the National Bank Act within its context, we discover a basis for inferring an implied definition of the term "interest" in section 30.

---

[6]In *Marquette*, the United States Supreme Court noted that the " 'most favored lender' status for national banks under *Tiffany* has since been incorporated into the regulations of the Comptroller of the Currency." (*Marquette Nat. Bank* v. *First of Omaha Corp., supra*, 439 U.S. at p. 314, fn. 26 [58 L.Ed.2d at p. 545].) See section 7.7310(a) of title 12 of the Code of Federal Regulations (1995): "A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or morris plan bank, without being so licensed."

Around the time of the passage of the National Bank Act, according to one definition then current in American legal usage, "interest" was a "sum of money paid or allowed by way of compensation for the loan or use of another sum . . . ." (2 Burrill, A New Law Dict. and Glossary (1851) p. 629, col. 1.) According to another such definition, "interest" was the "compensation which is paid by the borrower to the lender or by the debtor to the creditor for its use." (1 Bouvier, A Law Dict. (10th ed. 1860) p. 652, col. 1.) As subsequently restated by the United States Supreme Court: "Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention . . . ." (*Brown* v. *Hiatts* (1873) 82 U.S. (15 Wall.) 177, 185 [21 L.Ed. 128, 131].) This was the word's "plain meaning" (dis. opn. of Arabian, J., *post*, at p. 169) and "ordinary and commonly understood sense" (dis. opn. of George, J., *post*, at p. 179).[7]

Thus, the term "interest" readily embraced a periodic charge based on a percentage of a certain sum, either the amount lent or some other, payable absolutely by maturity.

But the word was not so limited. As reported decisions demonstrate, it could include as well a late payment fee, payable contingently in the event of default after maturity. Such a fee could be calculated as a periodic percentage charge. (See *Wilkinson* v. *Daniels* (Iowa 1848) 1 Greene 179, 188; see

[7]In English legal usage, from which the American derived, the term "interest" carried substantially the same broad meaning as indicated in the text. Thus, in *Arnott* v. *Redfern* (1826 C.P.) 130 Eng.Rep. 549, 551-552, the court declared: "[I]t appears there are two principles on which interest is given in our courts: first, where the intent of the parties that interest should be paid, is to be collected from the terms or nature of the contract; secondly, where the debt has been wrongfully detained from the creditor."

Compare 7 Oxford English Dictionary (2d ed. 1989) pages 1099 to 1100: In medieval Latin, "*interesse* (Interest) differed from *usura* (Usury) in that the latter was avowedly a charge for the use of money, which was forbidden by the Canon Law; whereas originally '*interesse* refers to the compensation which under the Roman Law, was due by the debtor who had made default. The measure of compensation was *id quod interest*, the difference between the creditor's position in consequence of the debtor's laches and the position which might reasonably have been anticipated as the direct consequence of the debtor's fulfilment of his obligation'." (Accord, *Library of Congress* v. *Shaw* (1986) 478 U.S. 310, 315, fn. 2 [92 L.Ed.2d 250, 257, 106 S.Ct. 2957] ["The institution of interest originated under Roman law as a penalty due from a debtor who delayed or defaulted in repayment of a loan. [Citation.] The measure of the penalty due for the default or delay was *id quod interest*—that which is between—the difference between the creditor's current position and what it would have been if the loan had been timely and fully repaid."].)

In his dissenting opinion, Justice George ignores the broad meaning of the term "interest" in American legal usage around the time of the passage of the National Bank Act. This is not surprising in view of the fact that, with the singular exception of *Greenwood Trust*, he fails to cite any of the scores of decisions and other authorities bearing directly on the question before the court.

generally, Annot., Provision for Interest After Maturity at a Rate in Excess of Legal Rate as Usurious (1933) 82 A.L.R. 1213, 1214-1223 [collecting pre- and post-National Bank Act decisions].) It could also be fixed as a flat fee. (See *Craig* v. *Pleiss* (1856) 26 Pa. 271, 271-272, 272-274; *Wernwag et al.* v. *Mothershead et al.* (Ind. 1834) 3 Blackford 401, 401-402; see generally, Annot., Provision for Interest After Maturity at a Rate in Excess of Legal Rate as Usurious, *supra*, 82 A.L.R. at pp. 1214-1223 [collecting pre- and post-National Bank Act decisions].)[8]

In view of the foregoing, we believe that the term "interest" in section 30 of the National Bank Act should be construed to cover late payment fees, if such fees are allowed by a national bank's home state. Recall the definition of "interest" as a "sum of money paid or allowed by way of compensation for the loan or use of another sum" (2 Burrill, A New Law Dict. and

---

[8]Even if used in conjunction with "rate," the term "interest"—contrary to what Justice Arabian implies in his dissenting opinion—was not limited to a periodic percentage charge, whether or not payable absolutely by maturity. (See *Wernwag et al.* v. *Mothershead et al.*, *supra*, 3 Blackford at pp. 401-402.) Thus, it was stated that a "promissory note . . . , on default of payment when due, drew interest at the rate specified in the note from the time it became due," to wit, " 'five dollars interest per week until paid.' " (*Ibid.*)

In his dissenting opinion, Justice George effectively asserts that the term "interest" could not include a late payment fee or indeed any other contingent charge. That is not so. *Lloyd* v. *Scott* (1830) 29 U.S. (4 Pet.) 205 [7 L.Ed. 833], on which he relies, does *not* define "interest" to exclude a late payment fee. It merely states that such a fee, "exceeding the *lawful* interest, . . . is not usury," i.e., *unlawful* interest, if avoidable by timely payment. (*Id.* at p. 226 [7 L.Ed. at p. 840], italics added.) Similarly, *Spain* v. *Hamilton's Administrator* (1864) 68 U.S. (1 Wall.) 604 [17 L.Ed. 619], on which he also relies, does *not* define "interest" to exclude a contingent charge. It merely states that such a charge "of itself would be deemed insufficient to make a loan usurious," i.e., bearing *unlawful* interest. (*Id.* at p. 626 [17 L.Ed. at p. 625].) Finally, Annotation, Provision for Interest After Maturity at a Rate in Excess of Legal Rate as Usurious, *supra*, 82 A.L.R. 1213, on which he relies as well, all but expressly defines "interest" to include a late payment fee. As it declares in its title, the annotation deals with "interest after maturity." (*Id.* at p. 1213.) By tautology, "*interest* after maturity" is interest; by convention, "interest *after maturity*" is a late payment fee. Furthermore, the annotation states, as the "general rule," that "a provision in a note or other contract for the payment of money, by which the debtor agrees to pay after maturity interest at a higher rate than permitted by the usury laws, or a sum of money which will exceed that rate, does not render the note or other contract usurious, if the parties in making the contract act in good faith, without intent of evading the usury law." (*Id.* at p. 1214.) That means that a late payment fee is indeed *interest*—and is generally *lawful* interest. In view of the foregoing, we are able to see through the assertion that a late payment fee "would *not* be considered interest for the purpose of determining whether the loan exceeded the legally permitted rate of interest." (Dis. opn. of George, J., *post*, at p. 180, italics in original.) The quoted language is an attempt, ultimately unsuccessful, to veil over the fact that such a fee was generally considered lawful interest.

In his dissenting opinion, Justice Arabian effectively asserts that the term "interest" did not include a late payment fee. In doing so, he merely begs the question, simply and repeatedly labeling such a fee a "*non*-interest-rate . . . term[]." (Dis. opn. of Arabian, J., *post*, at p. 165, italics in original; accord, *id.* at pp. 166, 169, 172, 173, & 174.) We need not respond.

Glossary, *supra*, p. 629, col. 1), or the "compensation which is paid by the borrower to the lender or by the debtor to the creditor for its use" (1 Bouvier, A Law Dict., *supra*, p. 652, col. 1). Such language easily encompasses late payment fees, as compensation for use of money, specifically, its retention, beyond the loan's term. Also recall the cited case law. It confirms the conclusion. Lastly, recall the statutory context. If "interest" were not read as indicated above, the purpose of facilitating a national banking system by granting national banks "most favored lender" status in their home states could be frustrated by unfriendly state legislation. Thus, a state could allow periodic percentage charges payable absolutely by maturity for all lenders, *including national banks*, but fix them at a rate so low that they could lend only at a loss. It might then allow late payment fees to some lenders, *not including national banks*, at a level high enough that *they* could lend at a profit. Such a result would be untenable.[9]

This is not to suggest that, in using the term "interest" in section 30 of the National Bank Act, Congress did not employ the word in the sense of a periodic percentage charge payable absolutely by maturity. It evidently did. (See, e.g., Cong. Globe, 38th Cong., 1st Sess., *supra*, at pp. 1373-1376, 2123-2128.)

But it is to state that, in doing so, Congress did *not* employ the word *only* in that sense. Certainly, "rate" was not tied exclusively to that sense. (See fn.

---

[9]In their separate dissenting opinions, Justice Arabian and Justice George suggest that Congress had no need to protect national banks through the "most favored lender" doctrine under section 30 of the National Bank Act insofar as late payment fees were concerned. To quote Justice George: "It has been quite well settled, since the early 1800's, that—even in the absence of a specific federal statutory prohibition—a state may *not* discriminate against a 'federal instrumentality' either in the enactment or the enforcement of state laws, and a national bank, of course, is a federal instrumentality." (Dis. opn. of George, J., *post*, at p. 182, italics in original; accord, dis. opn. of Arabian, J., *post*, pp. 171-172.) By the same reasoning, Congress had no need to protect national banks at all. In *Tiffany*, however, the United States Supreme Court concluded that Congress had *in fact* provided them protection, whether it *needed* to do so or not. We are bound thereby.

In his dissenting opinion, Justice Arabian attempts to deconstruct the "most favored lender" doctrine, transforming it from a rule to protect national banks in their home states from possible unfriendly state legislation into a mechanism to prevent states from abolishing banking as an institution. He fails in his endeavor. He cannot overcome Senator Sherman, who, as the sponsor in the Senate of the bill that would become the National Bank Act, urged "most favored lender" status for national banks. (See Cong. Globe, 38th Cong., 1st Sess., p. 2126 (1864).) Neither can he overcome the *Tiffany* court, which articulated the doctrine as here presented not long afterwards. Lastly, he cannot overcome the *Marquette* court, which reaffirmed the doctrine in the same form a century later. It may be noted in passing that the words of *Tiffany* on which he relies reflect a purpose not to prevent states from abolishing banking as an institution but, as explained in the text, to protect national banks in their home states from possible unfriendly state legislation, whether such legislation was unfriendly in intent or effect.

8, *ante*; see also *Sherman* v. *Citibank (South Dakota)* (1994) 272 N.J.Super. 435, 447 [640 A.2d 325], cert. granted (1994) 138 N.J. 270 [649 A.2d 1289] [stating that "[w]hile interest rate . . . has been defined as the numerical percentage rate of interest, . . . the phrase need not be read so restrictively when construed in its statutory and historical context"].) By the time of the National Bank Act, banking had begun to change rapidly and radically. (See 2 Redlich, The Molding of American Banking (1951) pp. 85-98.) So too, had governmental responses to such changes. (See *ibid.*) Aware that state legislation unfriendly to national banks had been enacted in the past (see, e.g., Madeleine, Monetary and Banking Theories of Jacksonian Democracy (1943) pp. 21-22; see also *McCulloch* v. *Maryland, supra,* 17 U.S. (4 Wheat.) at pp. 400-437 [4 L.Ed. at pp. 600-609]), Congress was also aware that such legislation might be proposed in the future (see, e.g., Cong. Globe, 38th Cong., 1st Sess., *supra,* p. 1376). It was evidently to forestall unfriendly state legislation that Senator Sherman urged "most favored lender" status for national banks. (See *id.* at p. 2126; see also fn. 9, *ante.*) Congress must have known that unfriendly state legislation could be predicated on measures other than differential provisions concerning periodic percentage charges payable absolutely by maturity. Without question, it did not purport to limit protection to such charges. A limitation of this sort might not have been inappropriate in an ephemeral measure. But it would have appeared out of place in the National Bank Act. In the words of Representative Hooper, who "reported the bill that was to become the National Bank Act . . . to the House from the Ways and Means Committee" (*Marquette Nat. Bank* v. *First of Omaha Corp., supra,* 439 U.S. at p. 315, fn. 28 [58 L.Ed.2d at p. 546]), the act was "not for a day" (Cong. Globe, 38th Cong., 1st Sess., *supra,* p. 1377). Quite the contrary. It was to perdure through the system of national banks that it established. Had Congress intended to limit protection, it would doubtless have made itself plain. It did not. Its silence is especially deafening when we consider that the immediate object of the National Bank Act was not the testing of an hypothesis concerning monetary theory, but rather the saving of the Union itself. (See *id.* at pp. 2128-2130.)[10]

In the years since the enactment of section 30 of the National Bank Act, including its codification in section 85, we have discerned nothing to affect

---

[10]In their separate dissenting opinions, Justice Arabian and Justice George assert—to quote only Justice George—that "[t]here is absolutely nothing in" section 30 of the National Bank Act "that suggests that Congress . . . intended the statutory reference to 'interest' to include" late payment fees. (Dis. opn. of George, J., *post,* at p. 180; accord, dis. opn. of Arabian, J., *post,* at pp. 167-168.) Nothing except the word itself, whose broad meaning in American legal usage around the time of the passage of the National Bank Act was a "sum of money paid or allowed by way of compensation for the loan or use of another sum" (2 Burrill, A New Law Dict. and Glossary, *supra,* p. 629, col. 1) or the "compensation which is paid by the borrower to the lender or by the debtor to the creditor for its use" (1 Bouvier, A Law Dict., *supra,* p. 652, col. 1). Justice Arabian's position is especially curious. He recognizes that the question of the word's meaning is "antiquarian." (Dis. opn. of Arabian, J., *post,* at p. 167.) He fails—or

the coverage of the term "interest." Amendments there have been. But none has borne on the point with which we are concerned.

Consequently, we believe that the term "interest" in section 85 should be construed to cover late payment fees, if such fees are allowed by a national bank's home state.[11]

Our construction of the term "interest" in section 85 accords with the decisions of practically all other courts. (See, e.g., *Ament v. PNC Nat. Bank, supra,* 849 F.Supp. at pp. 1018-1021; *Tikkanen v. Citibank (South Dakota) N.A.* (D.Minn. 1992) 801 F.Supp. 270, 274-280; *Nelson v. Citibank (South Dakota) N.A., supra,* 794 F.Supp. at pp. 316-320; *Copeland v. MBNA America, N.A.* (Colo.App. 1994) 883 P.2d 564, 565-566, cert. granted (Colo. 1994) 883 P.2d 564; *Sherman v. Citibank (South Dakota), supra,* 272 N.J.Super. at pp. 440-450; cf. *Greenwood Trust Co. v. Com. of Mass., supra,* 971 F.2d at pp. 829-830 [dealing with section 521 of DIDA: impliedly construing "the term 'interest' [in section 85] to encompass a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate," including, evidently, late payment fees on credit card accounts]; but cf. *Copeland v. MBNA America, N.A.* (D.Colo. 1993) 820 F.Supp. 537, 540-541 [criticizing reasoning set out in *Greenwood Trust*].)[12]

Our construction is also in line with interpretations of the Comptroller of the Currency, who "is charged with the enforcement of the [federal] banking

refuses—to see that the answer, as revealed in the definitions quoted above, is "antiquarian" as well.

[11]In his dissenting opinion, Justice George takes the position that the term "interest" in section 85 does not include any contingent charge, including a late payment fee. He founders on *Marquette.* There, the United States Supreme Court treated as "interest" the apparently typical periodic percentage charges on credit card transactions *that are contingent on the borrower's failure to pay his balance in full. (Marquette Nat. Bank v. First of Omaha Corp., supra,* 439 U.S. at p. 302 [58 L.Ed.2d at p. 538].)

[12]We recognize that, in *Mazaika v. Bank One, Columbus, N.A.* (1994) 439 Pa.Super. 95, 100-110 [653 A.2d 640, 643-647], the Pennsylvania Superior Court, sitting in bank, held that the term "interest" in section 85 must be construed to cover only periodic percentage charges payable absolutely by maturity. In *Gadon v. Chase Manhattan Bank, (USA)* (1995) 439 Pa.Super. 210, 213-215 [653 A.2d 697, 699], and *In re Citibank* (1995) 439 Pa.Super. 79, 80-81 [653 A.2d 39, 40], panels of the Pennsylvania Superior Court followed *Mazaika.* We cannot. *Mazaika*—which is essentially unique among reported decisions—is altogether unpersuasive. It asserts, in substance, that in enacting section 30 of the National Bank Act Congress did not "intend[] anything other than the ordinary and popular meaning of the word 'interest', which a person of average intelligence and experience would understand," apparently a periodic percentage charge payable absolutely by maturity. (*Mazaika v. Bank One, supra,* 439 Pa.Super. at p. 110 [653 A.2d at p. 647].) The analysis in the text proves this statement wrong. We note in passing that the Pennsylvania Supreme Court has granted a petition for allowance of appeal in *Mazaika.* (No. 31 E.D. Allocatur Dock., May 25, 1995.) It has done the same in *In re Citibank.* (No. 80 E.D. Allocatur Dock., May 31, 1995.)

laws" (*Investment Co. Institute* v. *Camp* (1971) 401 U.S. 617, 627 [28 L.Ed.2d 367, 376, 91 S.Ct. 1091]; accord, *NationsBank of N.C.* v. *Variable Annuity Life Ins.* (1995) ___ U.S. ___, ___ [130 L.Ed.2d 740, 747, 115 S.Ct. 810, 813]). (See, e.g., Off. of the Comptroller of the Currency, Notice of Proposed Rulemaking (Mar. 3, 1995) 60 Fed.Reg. 11924, 11940 [proposing to add subdivision (a) of section 7.4001 to title 12 of the Code of Federal Regulations, which would provide that "[t]he word 'interest' as used in 12 U.S.C. 85 includes . . . late fees"]; Off. of the Comptroller of the Currency, Interpretative Letter by Julie L. Williams, Chief Counsel (Feb. 17, 1995) pp. 9-11; Off. of the Comptroller of the Currency, Interpretative Letter by Robert B. Serino, Deputy Chief Counsel (Policy) (Aug. 11, 1988) pp. 5-8; Off. of the Comptroller of the Currency, Interpretative Letter by L.A. Jennings, Deputy Comptroller of the Currency (Feb. 24, 1955) p. 1; cf. Fed. Deposit Ins. Corp., Advisory Opn. by Douglas H. Jones, Deputy General Counsel, FDIC No. 92-47 (July 8, 1992) p. ___, Fed. Bank. L. Rep. (CCH 1992-1993 Transfer Binder) ¶ 81,534, p. 55,731 [opining that section 521 of DIDA gives a covered financial institution the "right to charge late fees . . . permitted by [its] home state which are either a component of interest or material to the determination of the interest rate"].)[13]

Lastly, our construction conforms with views of commentators. (See, e.g., Clark & Clark, The Law of Bank Deposits, Collections and Credit Cards (rev. ed. 1995) ¶ 15.09[2][c], pp. 15-56 to 15-61 & especially pp. 15-59 to 15-60; Rosenblum, *Exporting Annual Fees* (1986) 41 Bus. Law. 1039, 1042-1044.)

Against our conclusion, Smiley argues that the term "interest" in section 85 may not, or at least should not, be construed to cover late payment fees, even if such fees are allowed by a national bank's home state. She asserts that the word should instead be interpreted as such compensation as is *either* "based on the amount of the loan balance" *or* "measured over time" *or* "required up-front as consideration for the loan."

Smiley's argument in favor of her own construction of the term "interest" in section 85 is unpersuasive. On its very face, her interpretation is peculiar.

---

[13]We recognize that, in a letter dated June 25, 1964, the then Comptroller of the Currency stated to a correspondent: "[Y]ou inquired as to what charges paid by consumers for consumer credit obtained from a National Bank with respect to auto financing are not considered to be interest. Charges for late payments . . . are illustrations of charges which are made by some banks which would not properly be characterized as interest." The letter was perfunctory. It did not even mention section 85. We agree with the present Comptroller of the Currency: "It is not clear that the quoted passage was issued in the context of a determination of whether the term 'interest' used in Section 85 includes late charges nor does the context of the letter clearly indicate that it is intended as a ruling of the agency with respect to that question."

It is not supported by either reason or authority. Hence, it cannot be accepted. Certainly, it might produce untoward consequences. Specifically, it might effectively limit the variety of credit terms permitted on an interstate loan by a national bank, because any such term beyond its scope would be subject to the varying laws of the several states—a result that might "throw into confusion the complex system of modern interstate banking" (*Marquette Nat. Bank* v. *First of Omaha Corp.*, *supra*, 439 U.S. at p. 312 [58 L.Ed.2d at p. 544]), and thereby undermine the conditions for uniformity and efficiency that would otherwise obtain. To limit the variety of credit terms would obviously have an adverse effect on the national bank itself, whose freedom to lend on conditions it deems reasonable would be restricted. But it would have a correspondingly adverse effect on the national bank's potential customer, whose freedom to *borrow* on conditions *he* deems reasonable would also be restricted. To the extent that Smiley suggests that it is no longer necessary "to protect [national banks] against possible unfriendly State legislation" (*Tiffany* v. *National Bank of Missouri*, *supra*, 85 U.S. (18 Wall.) at p. 412 [21 L.Ed. at p. 863]), she is wrong. States have continued to enact measures that are unfriendly in effect, if not in intent. (See, e.g., *Fisher* v. *First Nat. Bank of Omaha* (8th Cir. 1977) 548 F.2d 255, 258-261, 31 A.L.R.Fed. 792; *Northway Lanes* v. *Hackley Union Nat. Bank & Trust Co.* (6th Cir. 1972) 464 F.2d 855, 861-864; *United Missouri Bank of Kansas City* v. *Danforth* (W.D.Mo. 1975) 394 F.Supp. 774, 779-785; *Saul* v. *Midlantic Nat. Bank/South* (1990) 240 N.J.Super. 62, 80-82 [572 A.2d 650].)

Smiley's argument against our construction of the term "interest" in section 85 is as unpersuasive as her argument in favor of her own.

In part, Smiley asserts that the term "interest" in section 85 may not be construed to cover late payment fees, even if such fees are allowed by a national bank's home state. To do so, she claims, would compel a conclusion that Congress failed to define the word itself, but rather delegated the task to the several states in violation of section 1 of article I of the United States Constitution, which "vests" in it "[a]ll legislative Powers [t]herein granted." That is simply not the case. Congress has made no such delegation. As shown above, it has itself defined the word, impliedly if not expressly, to cover late payment fees, if such fees are allowed by a national bank's home state. True, it has adopted in this regard, as by a choice-of-law provision, the usury law of the national bank's home state as the rule governing all loans by the bank in question, even interstate loans, notwithstanding the law of any other state. It has thereby entrusted the question of the lawfulness of a national bank's late payment fees to its home state and to its home state alone. But it has not thereby made a delegation. In *United States* v. *Sharpnack* (1958) 355 U.S. 286, 294 [2 L.Ed.2d 282, 288, 78 S.Ct. 291], the

United States Supreme Court concluded that Congress did not delegate its legislative powers to the several states in the Assimilative Crimes Act of 1948, in which it adopted for each federal enclave the criminal law of the state in which such enclave is situated. ▇ Here, we conclude that Congress did not delegate its legislative powers to the several states in section 85, in which it adopted for each national bank the usury law of the state in which such bank is located. (Accord, *Tikkanen* v. *Citibank (South Dakota) N.A., supra,* 801 F.Supp. at p. 280; *Sherman* v. *Citibank (South Dakota), supra,* 272 N.J.Super. at p. 449.)

In other part, Smiley asserts that the term "interest" in section 85 at least should not be construed to cover late payment fees, even if such fees are allowed by a national bank's home state. She says that the word as used in other contexts is of narrower compass. What is dispositive, however, is the word *as used here*.

Some of the non-section-85 authorities on which Smiley relies do not, in fact, show the term "interest" employed in a limited sense. Thus it is with section 521 of DIDA. Its purpose is "to achieve a measure of parity and competitive equity between national banks and" federally insured state banks and federally insured branches of foreign banks "by permitting" the latter "to enjoy the same 'most favored lender' status that national banks enjoy." (*Hunter* v. *Greenwood Trust Co.* (1994) 272 N.J.Super. 526, 533 [640 A.2d 855], cert. granted (1994) 138 N.J. 270 [649 A.2d 1289]; accord, *VanderWeyst* v. *First State Bank of Benson* (Minn. 1988) 425 N.W.2d 803, 805-807.) There is no suggestion that "interest" in section 521 of DIDA is more restricted than in section 85. But if there were, it would be based on a fact peculiar to the former, viz., that it was enacted, in part, as a response to a situation that was greatly concerned with "interest" *in the sense of a periodic percentage charge payable absolutely by maturity*: as a matter of national economic necessity, covered financial institutions could not prudently lend money unless they imposed charges that were relatively high (*Greenwood Trust Co.* v. *Com. of Mass., supra,* 971 F.2d at p. 826); but as a matter of state law, they were required to impose charges that were relatively low (*ibid.*).[14] It scarcely needs mention that the "legislative history of [section 521 of DIDA], enacted in 1980, does not bear on the legislative

---

[14]See also Senate Report No. 96-368, 1st Session, page 19 (1979), 1980 United States Code Congressional and Administrative News, at page 255 (dealing with section 501 of DIDA, codified in section 1735f-7a of title 12 of the United States Code, which concerns state law provisions limiting the amount or rate of interest, discount points, or finance or other charges *with respect to mortgage loans*: "In exempting mortgage loans from state usury limitations, the Committee [on Banking, Housing, and Urban Affairs] intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations

history of [section 30 of] the National Bank Act, enacted in 1864." (*Nelson v. Citibank (South Dakota) N.A.*, *supra*, 794 F.Supp. at pp. 319-320.) We surely do not discern in section 521 of DIDA any understanding on the part of Congress that section 85 uses "interest" narrowly. Neither can we detect any intent by that body to implicitly "amend" the latter provision through the former.

By contrast, other of the non-section-85 authorities on which Smiley relies do indeed show the term "interest" employed in a limited sense—but, by definition, not in section 85. Thus, in *United States* v. *Texas* (1993) 507 U.S. 529, 535-536 [123 L.Ed.2d 245, 253-254 113 S.Ct. 1631, 1635-1636]—which does not even allude to section 85—it is held that federal common law requires a party owing a contractual debt to the United States to pay "prejudgment interest," which evidently does not include "processing fees" or "penalty charges." But "prejudgment interest" under this rule has nothing to do with "interest" in section 85. Similarly, in section 102 et seq. of the Truth in Lending Act (hereafter TILA), which has been codified in section 1601 et seq. of title 15 of the United States Code, and its implementing administrative regulation, Regulation Z, which has been codified in part 226 of title 12 of the Code of Federal Regulations (1995)—neither of which even cites section 85—"finance charge" is defined to include "interest" (15 U.S.C. § 1605(a)(1); 12 C.F.R. § 226.4(b)(1) (1995)) but to exclude, for example, late payment fees (12 C.F.R. § 226.4(c)(2) (1995)). But "finance charge" under this provision and regulation has nothing to do with "interest" in section 85. Moreover, the purpose of TILA is substantially different from that of section 85, inasmuch as the former "provides for full disclosure of credit terms rather than regulation of the terms or conditions under which credit may be extended" (*Johnson* v. *McCrackin-Sturman Ford, Inc.* (3d Cir. 1975) 527 F.2d 257, 262, 34 A.L.R.Fed. 450), whereas the latter is concerned with the regulation of such terms and conditions insofar as they may be established by national banks.[15]

■ In addition, Smiley specifically asserts that the term "interest" in section 85 necessarily excludes late payment fees (at least such as are

designed to protect borrowers."); accord, section 590.3(c) of title 12 of the Code of Federal Regulations (1995) (administratively implementing section 501 of DIDA by regulation).

[15]Other of the non-section-85 authorities on which Smiley relies are no more helpful to her cause. See, e.g., *Lloyd* v. *Scott*, *supra*, 29 U.S. (4 Pet.) at page 226 [7 L.Ed. at page 840] (pre-National Bank Act decision: not defining "interest"; stating that "a specific sum, exceeding the lawful interest," in case of late payment is not usury but a permissible penalty if avoidable by timely payment); *Spain* v. *Hamilton's Administrator*, *supra*, 68 U.S. (1 Wall.) at pages 625-626 [17 L.Ed. at page 625] (pre-National Bank Act decision: to similar effect); *Insurance Company* v. *Piaggio* (1873) 83 U.S. (16 Wall.) 378, 386 [21 L.Ed. 358, 360] (not defining "interest," either generally or specifically under section 30 of the National Bank Act; stating that a party "cannot recover special damages for the detention of money due to him beyond what the law allows as interest"); *United States* v. *Childs* (1924) 266 U.S. 304, 307 [69 L.Ed. 299, 300, 45 S.Ct. 110] (not defining "interest," either generally or specifically

calculated as flat fees) because they are "penalties." That is simply not the case. (See *Sherman* v. *Citibank (South Dakota)*, *supra*, 272 N.J.Super. at p. 447 [stating that "there is nothing in the dictionary definition of interest which necessarily excludes late fees from the scope of that term"]; cf. *Citizens' National Bank* v. *Donnell* (1904) 195 U.S. 369, 373-374 [49 L.Ed. 238, 241, 25 S.Ct. 49] (per Holmes, J.) [implying that "interest" under section 30 of the National Bank Act may include overdraft charges].)

To the extent that Smiley maintains that late payments fees are, or at least were, unlawful per se under the common law, she is wrong. (See Annot., Provision for Interest After Maturity at a Rate in Excess of Legal Rate as Usurious, *supra*, 82 A.L.R. at pp. 1214-1223; Annot., Provision for Interest After Maturity at a Rate in Excess of Legal Rate as Usurious or Otherwise Illegal (1969) 28 A.L.R.3d 449, 454-465.)

To the extent that Smiley maintains that late payments fees are unjustifiable as a matter of policy, she is also wrong. As a general matter at least, late payment has no social utility. Indeed, it causes various costs relating to default, including collection—costs that may be especially high when, as is typically the case in credit card transactions, the underlying loan is unsecured. Late payment fees may be employed to impose default costs on late payers, who are responsible for them, and to avoid shifting them to timely payers, who are not. Fairness is served thereby: late payment fees make late payers shoulder the burden they themselves have created. In addition, the efficient use of limited resources is furthered: late payment fees deter late payers from creating the burden in the first place. Without question as to their legitimacy, differential periodic percentage charges payable absolutely by maturity are used to impose default costs, albeit *prospectively* on *projected* late payers, with higher or lower charges depending on the borrower's creditworthiness. It can be argued that late payment fees may properly be

---

under section 30 of the National Bank Act; stating that a "penalty is a means of punishment; interest a means of compensation"); *Kothe* v. *R.C. Taylor Trust* (1930) 280 U.S. 224, 226 [74 L.Ed. 382, 384, 50 S.Ct. 142] (not defining "interest," either generally or under section 85 specifically; distinguishing liquidated damages and penalties); *Merchants' Nat. Bank* v. *Sevier* (C.C.E.D.Ark. 1882) 14 Fed. 662, 665 (not defining "interest," either generally or specifically under section 30 of the National Bank Act; implying that parties may not "lawfully stipulate for the payment of an attorney's fee, *in addition to* the principle [*sic*] and interest of the debt, and the costs and fees allowed by law" [italics added]); *In re Tastyeast, Inc.* (3d Cir. 1942) 126 F.2d 879, 882 (not defining "interest," either generally or under section 85 specifically: similar to *Kothe*); *Smith Mach. Co., Inc.* v. *Jenkins* (10th Cir. 1981) 654 F.2d 693, 696 (not defining "interest," either generally or under section 85 specifically: similar to *Lloyd* and *Spain*).

In his dissenting opinion, Justice George relies on a number of the non-section-85 authorities that we have considered. (See dis. opn. of George, J., *post*, at p. 181, fn. 1.) To no avail. (See p. 159, fn. 14, & pp. 159-160, *ante*.)

used to achieve the same end *retrospectively* on *actual* late payers: it may be said to be more equitable to require a given sum in late payment fees after the term of the loan from a borrower who turns out to be late than to extract the same—or perhaps a greater—sum through a higher periodic percentage charge payable absolutely by maturity throughout the loan's term from a borrower who proves himself to be timely.

Smiley may then be understood to argue that, even if the term "interest" in section 85 is construed to cover late payment fees, if such fees are allowed by a national bank's home state, it should not be deemed preemptive—or, in *Marquette*'s word, "exportable"—against a sister state's law involving its " 'historic police powers' " in consumer protection and banking, " 'unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone* v. *Liggett Group, Inc., supra*, 505 U.S. at p. 516 [120 L.Ed.2d at p. 422, 112 S.Ct. at p. 2617].) As *Marquette* effectively holds, such a purpose may indeed be discerned in section 85. To the extent that she asserts that federal law may not preempt state law of this sort other than expressly, she finds no support in reason or authority.

Smiley may next be understood to argue that, even if the term "interest" in section 85 is construed to cover late payment fees, if such fees are allowed by a national bank's home state, it should not be deemed preemptive against a sister state's law beyond periodic percentage charges payable absolutely by maturity, or, perhaps more broadly, beyond such charges as are *either* "based on the amount of the loan balance" *or* "measured over time" *or* "required up-front as consideration for the loan." We do not see any logical basis for such a limitation. (See *Tikkanen* v. *Citibank (South Dakota) N.A., supra*, 801 F.Supp. at p. 277 [stating that "nothing in the language of section 85 supports a definition of interest that fluctuates according to whether the national bank seeks to apply the interest to interstate or intrastate transactions"]; *Nelson* v. *Citibank (South Dakota) N.A., supra*, 794 F.Supp. at p. 320 [stating that such a definition "is without statutory support" and is, in fact, "untenable"].) Neither do we see any practical ground therefor. Substance must prevail over form. Simply put, a borrower is equally affected by paying $15 in periodic percentage charges payable absolutely by maturity or $15 in late payment fees. (See *First National Bank in Mena* v. *Nowlin* (8th Cir. 1975) 509 F.2d 872, 878.)

Smiley may lastly be understood to argue that, even if the term "interest" in section 85 is construed to cover late payment fees, if such fees are allowed by a national bank's home state, it should not be deemed preemptive against a sister state's *common law*. She is unpersuasive. Her sole basis is section 521 of DIDA, which is inapplicable, or more accurately, her peculiar interpretation of that provision, which is overly narrow (see *Hunter* v.

*Greenwood Trust Co.*, *supra*, 272 N.J.Super. at pp. 537-540). Contrary to her underlying assertion as to the latter provision, *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. 504, did *not* hold that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." (*Freightliner Corp.* v. *Myrick* (1995) __ U.S. __, __ [131 L.Ed.2d 385, 393, 115 S.Ct. 1483, 1487].)

In making her various arguments, Smiley criticizes the reasoning of the *Greenwood Trust* court and the views of the Comptroller of the Currency. Since we have not relied on either except to show that the conclusions that we ourselves have arrived at are not novel, we need not respond to her complaints.[16]

 We acknowledge that, to construe the term "interest" in section 85 to cover late payment fees, if such fees are allowed by a national bank's home state, would empower a national bank to "export" its home state's law of usury in that regard. We also acknowledge that such "exportation" of the usury law of a national bank's home state would prevent sister states from enforcing their own usury laws to that extent against the national bank in question by entrusting the question of the lawfulness of the national bank's late payment fees to its home state and to its home state alone. We cannot, and do not, ignore the immanent threat to efforts by sister states to provide such protection as they deem fit to consumers who reside therein. But—to follow *Marquette*—this displacement of the usury laws of sister states has always been implicit in the structure of the National Bank Act, since residents of one state have ever been free to visit another to receive credit subject to the latter's usury law, even when that law permits unlimited interest. This displacement may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. The protection of the usury laws of sister states, however, is an issue of policy committed to Congress. Any plea to amend section 85 to further that end must be addressed to that body and not to this.

### C

Applying the law as set out above, we must reject Smiley's contention that Court of Appeal erred in its conclusion upholding the superior court's order granting Citibank's common law motion for judgment on the pleadings.

---

[16]*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503], *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197], and *Beasley* v. *Wells Fargo Bank* (1991) 235 Cal.App.3d 1383 [1 Cal.Rptr.2d 446], on which Smiley relies, are each inapposite. None even mentions section 85.

Confining ourselves to Smiley's complaint and accepting as true all material facts alleged therein, we believe that the pleading does not state facts sufficient to constitute a cause of action against Citibank.

Smiley's complaint is based on California law bearing on the amount of late payment fees. It is, however, without support because that law is preempted as to Citibank through section 85. Citibank is a national bank. Its home state is South Dakota. Because the term "interest" in section 85 covers late payment fees, if such fees are allowed by a national bank's home state, it embraces Citibank's late payment fees, which are permitted by South Dakota pursuant to section 54-3-1 of the South Dakota Codified Laws Annotated. Whether California law would prohibit such fees, at least under certain circumstances, is of no consequence. That law is displaced.[17]

Against our conclusion, Smiley argues to the following effect: her complaint "alleges" as a "material fact" that Citibank's late payment fees for its credit card accounts are not late payment fees *within the meaning of South Dakota law*, but rather "penalties"; if this "material fact" is accepted as true, California law bearing on the amount of late payment fees is not preempted as to Citibank through section 85; and if California law is not preempted in this regard, the superior court's order granting Citibank's motion was erroneous, and the Court of Appeal's conclusion upholding that order was erroneous as well.

We are not persuaded. Smiley's complaint simply does not "allege" as a "material fact" that Citibank's late payment fees for its credit card accounts are not late payment fees within the meaning of South Dakota law, but rather "penalties." Indeed, the pleading does not even allude to South Dakota law at all. With the premise of her argument gone, the conclusion falls of its own weight. In any event, we ourselves have considered the question independently, and conclude that the late payment fees in question are indeed late payment fees within the meaning of South Dakota law, and not "penalties."[18]

[17]We note in passing that Citibank's late payment fees appear roughly comparable to those authorized by the subsequently added section 4001 of the Financial Code, which deals with late payment fees. (See fn. 2, *ante*.)

We also note in passing that Smiley's construction of the term "interest" in section 85 as such compensation for use of money under loan as is *either* "based on the amount of the loan balance" *or* "measured over time" *or* "required up-front as consideration for the loan" seems broad enough to embrace Citibank's late payment fees for its "Preferred" credit card accounts, at least in part, because those fees—as shown by matters of which we have taken judicial notice (see fn. 2, *ante*)—appear, at least in part, to be set with regard to the account balance *and* to be determined over monthly periods.

[18]Smiley may be understood to contend that Court of Appeal erred in its conclusion upholding the superior court's order granting Citibank's common law motion for judgment on

III

For the reasons stated above, we conclude that the judgment of the Court of Appeal must be affirmed.

Kennard, J., Baxter, J., Werdegar, J., and Ardaiz, J.,* concurred.

**ARABIAN, J.**—I dissent. The majority offers up a thoroughgoing revision of the history of American banking to justify a result that could not conceivably have been in the minds of the members of the Civil War Congress. It is, moreover, one that ignores not only an unambiguous statutory text and a consistent legislative history but what is perhaps the most prominent feature of American banking since the National Bank Act was passed in 1864—the "dual banking system," under which Congress has historically deferred to the interests of the states in the regulation of national banks as to all matters except those essential to their role as instrumentalities of the federal government.

The setting of *non*-interest-rate credit card terms—like the late payment penalties charged California credit card users by out-of-state national banks at issue in this case—is a matter appropriate for regulation by the California Legislature. It is not one to be determined by the legislatures of a handful of small or sparsely populated states that have deregulated consumer credit in an attempt to attract the interstate credit card operations of large national banks.[1]

It may be that a nationwide banking system, especially in the consumer financial services marketplace, is the inexorable future of American banking. We have not as a nation reached that point, however, and the decision to do

---

the pleadings *insofar as that order failed to grant her leave to amend her complaint.* The claim fails. True, leave to amend a complaint—like the present—that does not state facts sufficient to constitute a cause of action should generally be granted if there is a reasonable possibility that the defect can be cured. (See, e.g., *Carney v. Simmonds* (1957) 49 Cal.2d 84, 97 [315 P.2d 305].) No possibility of this sort appears here. Certainly, the defect cannot be cured by "alleging" as a "material fact" that Citibank's late payment fees are not late payment fees within the meaning of South Dakota law.

*Presiding Justice, Court of Appeal, Fifth Appellate District, assigned by the Acting Chairperson of the Judicial Council.

[1]Examining the shifting terrain of modern American banking in 1981, Judge Douglas Ginsburg wrote that "We have already seen Citicorp relocating some of its retail operations in South Dakota, and the Chase Manhattan and Morgan banks undertaking similar moves to Delaware . . . . In return for jobs and taxes, these jurisdictions have traded local entry rights and powers, but in each case their real purpose is to serve as a base state for [national] retail banking: the national charter enables the banks to extend credit to residents of other states at their new 'home' state interest rates, and newly provided state laws make these interest rates unlimited." (Ginsburg, *Interstate Banking* (1981) 9 Hofstra L.Rev. 1133, 1370, fns. omitted.)

so and the means by which a truly interstate system of banking is to be effected are matters for Congress to decide, not a few large national banks aided by the compliant Legislatures of South Dakota and Delaware.[2]

I

The majority begins with the proposition that the purpose of the National Bank Act of 1864 (12 U.S.C.) was to grant to the newly established national banks "most favored lender status" by permitting them to charge the highest *rate of interest* allowed to lenders (including non-bank lenders) by the state in which the national bank is located. That, I agree, is the holding of the high court in *Tiffany* v. *National Bank of Missouri* (1874) 85 U.S. (18 Wall.) 409 [21 L.Ed. 862] (*Tiffany*). From the platform of this almost commonplace perception, rooted in the language of the *Tiffany* opinion itself, the majority then vaults to the far more disputable conclusion that Congress must have had in mind, not only "interest" in its "popular sense"—a sum charged for the lending of money, calculated at a periodic percentage over time, that is, *rates* of interest—but noninterest-rate credit terms such as, in this case, "late payment fees, if such fees are allowed by a national bank's home state." (Maj. opn., *ante*, at p. 153.)

This expansive definition of interest is required, according to the majority, not because of any evidence that Congress *actually* had such an idea in mind when it enacted the National Bank Act; in fact, there is not a particle of textual or legislative evidence to support such a view. Instead, the majority reasons that Congress must have intended to give "interest" such a broadened definition because limiting the word's meaning to the one that is obvious on the face of the statute would have allowed unfriendly state legislatures to "frustrate" the rise of the national banks by passing discriminatory measures imposing low *noninterest* terms (such as late fee penalties) on such banks while increasing the ceilings on such charges that state banks could impose. Such a course would have led to the destruction of the national banks, the majority reasons, an outcome Congress could not have

---

[2] It is worth noting that the power of the South Dakota Legislature to affect the interests of California credit card holders endorsed by the majority is not limited to the setting (or the removal) of ceilings on late payment penalties; it encompass as well the manipulation of the following credit card charges: annual fees, grace periods, conditions of default, changes in terms provisions, bad check charges, and restrictions on the imposition of attorney fees and collection costs. (See Burgess & Ciolfi, *Exportation or Exploitation? A State Regulator's View of Interstate Credit Card Transactions* (1987) 42 Bus. Law. 929, 930.) As the majority point out, the Legislature enacted a measure effective January 1, 1995, adding division 1.1 to the Financial Code, dealing with the setting of fees in consumer credit transactions. (See maj. opn., *ante*, at p. 145, fn. 2.) Notwithstanding this recent change, the federalist question remains not how the Legislature has decided to regulate consumer financial services, but the extent of its power to act as it sees fit.

desired. To avoid such a result, the majority concludes, "the term 'interest' in section 30 of the National Bank Act should be construed to cover late payment fees . . . ." (Maj. opn., *ante*, at p. 153.)

Like the proverbial red thread, a misconception not only of the high court's opinion in *Tiffany, supra,* 85 U.S. (18 Wall.) 409, but of the economic conditions prompting the enactment of the National Bank Act on which the *Tiffany* opinion rests, runs through the logic of the majority's view. A sharp pull on this skein of error—by demonstrating the misreading of *Tiffany* and of the larger historical context of American banking in the immediate aftermath of the Civil War—and the fabric of the opinion unravels.

### A

We begin with the text of the statute itself. In enacting what was originally section 30 of the National Bank Act in 1864, Congress used the word "interest" a total of four times. It used the word "rate," however, a total of *nine* times, more than twice as often as it used the word "interest." Indeed, "interest" *does not appear in a single sentence of section 30 unaccompanied by the word "rate"*; the statute commonly links directly the two ideas, referring to "rates of interest" or "interest at a rate of," although sometimes it refers to "rates" *without* referring to "interest" in the same sentence. Whatever broader currency the word "interest" may have had in American society at large in the mid-19th century, uncoupled from the notion of rates, it is highly likely that in enacting section 30, Congress actually had in its collective mind a much narrower and more precise understanding, the one the majority calls the "popular sense" of the word: a sum linked to the lending of money calculated at a *rate* or a percentage of the loan over time.

Such a self-evident and unambiguous use of the term should mark the end of the inquiry, the question before this court being, after all, the antiquarian one of the content Congress probably ascribed to a word inserted in a statute in 1864. The answer, it is evident to me, is furnished by the text of the statute itself. Another court, examining the identical question, and rejecting the very construction placed on the text by the majority, has written that "a proposition that is not obvious from the plain meaning of a statute's language, nor from its legislative history, simply cannot be regarded as a clear manifestation of congressional intent." (*Copeland* v. *MBNA America, N.A.* (D.Colo. 1993) 820 F.Supp. 537, 541; see also *Mazaika* v. *Bank One, Columbus, N.A.* (1994) 439 Pa.Super. 95, 110 [653 A.2d 640, 647] (in bank) [". . . we are simply unable to find that Congress, when it used the phrase 'interest at the rate' in enacting Section [30] . . . intended anything other

than the ordinary and popular meaning of the word 'interest', which a person of average intelligence and experience would understand. (Fn. omitted.)"].)

During the Senate debate on the bill that became the National Bank Act, moreover, the talk was of interest "rates," not of abstract notions of interest encompassing the expansive formulation of the majority. Thus, in the midst of the debate over the bill's terms on May 5, 1864, the senators discussed the controversial proposal whether to enact into law a national interest rate ceiling of 7 percent. Senator Grimes of Iowa sought to have the ceiling reduced to 6 percent, the figure prevailing in his state. "This bill purports to be a bill to provide a national currency, and its friends claim that it is to have a uniform operation all through the country. Let me tell the Senate how it will operate in [Iowa]. In the State of Iowa the legal *rate of interest* is six per cent., but where special contracts are entered into the parties can receive ten *per cent.* Under this bill as it stands each of these national banks can receive ten *per cent.* on all its discounts and all its monetary transactions, while in the adjacent States the rate will be only six *per cent.*" (Cong. Globe, 38th Cong., 1st Sess. (1864) p. 2123.)

After further criticizing the measure, the senator concluded, "This is no time to be increasing the *rate of interest.*" Senator Pomeroy of Kansas disagreed: "I only desire to say that I think a uniform *rate of interest* is desirable and should be fixed in this bill, if it is to be a bill to establish a national currency . . . ." Senator Trumbull disagreed with both of his colleagues. "Money is worth more in some portions of the country than others. Money commands a higher *rate of interest* in new sections of the country than it does in the old. . . . This provision . . . allows the same *rate of interest* in a State which is allowed by the laws of the State." (Cong. Globe, 38th Cong., 1st Sess., *supra*, at pp. 2123-2124, italics added throughout.)

Examples could be multiplied, but there would be little point. The fact is that there is literally nothing in the reported debates on the bill that became the National Bank Act of 1864 to suggest that the drafters of the measure had anything in mind beyond the common sense, conventional notion of "rates of interest." The record of the congressional debates on the meaning of "interest" as Congress used it in the National Bank Act is thus further evidence—in addition to the unambiguous text of the statute itself—that Congress had in mind a notion of interest that was linked ineluctably to rates. (See Cong. Globe, 38th Cong., 1st. Sess., *supra*, at pp. 2123-2125.)

B

Indeed, the repeated and uniform linkage of "interest" with "rates of interest" in both statutory text and Senate debate is so clear and unwavering

that even the majority quickly abandons any pretense of adhering to the plain meaning of the statute. Instead, it falls back on a kind of argument from necessity which it then projects onto an undisclosed consciousness of the Civil War Congress. The source of this line of argument is the high court's opinion in *Tiffany, supra,* 85 U.S. (18 Wall.) 409, mobilized by the majority as the pivot for an expansive reading of the word "interest" as it appears in section 30 of the National Bank Act.

Here is the argument deployed by the majority to support its central conclusion: "Thus, a state could allow periodic percentage charges payable absolutely by maturity for all lenders, *including national banks,* but fix them at a rate so low that they could lend only at a loss. It might then allow late payment fees to some lenders, *not including national banks,* at a level high enough that *they* could lend at a profit. Such a result would be untenable." (Maj. opn., *ante,* at p. 154, italics in original.)

A fair reading of the opinion in *Tiffany, supra,* 85 U.S. (18 Wall.) 409, however demonstrates that the high court, writing a mere nine years after the passage of the National Bank Act, alluded not to Congress's fear of the specter of discriminatory rate setting against *national* banks by the states, but to its concern that state legislatures might abolish *all banks,* state *and* federal. Such an anxiety over the fate of the entire business of banking lends no support to the majority's claim that Congress must have been motivated to provide against the contingency of discriminatory rate setting by incorporating (with conspicuous silence) an understanding of "interest" that includes charges unrelated to what is the obvious subject of section 30—that is, "rates of interest."

Here is the critical text of Justice Strong's opinion in *Tiffany, supra,* 85 U.S. (18 Wall.) 409, upon which the majority relies for its central tenet that Congress must have had in mind a notion of interest broad enough to encompass not just rates of interest, but noninterest-rate credit card terms including, in this case, late payment penalties, in order to avoid state discrimination against national banks: "It was expected that [national banks] would come into competition with State banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this they were empowered to reserve interest at the same rates . . . which were allowed to similar State institutions. This was considered indispensable to protect them against possible unfriendly State legislation. Obviously, if State statutes should allow [state] banks . . . a rate of interest greater than the ordinary rate allowed to natural persons, National [banks] could not compete with them, unless allowed the same. On the other hand, if such [national banks] were restricted to the rates allowed . . . to [state] banks

. . . , unfriendly legislation might make their existence in the state impossible. A rate of interest might be prescribed so low that *banking could not be carried on*, except at a certain loss." (85 U.S. (18 Wall.) at pp. 412-413 [21 L.Ed. at pp. 863-864], italics added.)

I suppose it is possible to construe this text as referring to the threat of state discrimination against national banks by the setting of interest rate differentials that favored state banks. In point of historical fact, however, the greater likelihood is that Justice Strong had in mind what the words of his opinion literally convey: that the states might enact legislation that, far from favoring state banks over national banks, would sweep away *all banks*, leaving the business of lending (and the circulation of bank notes) to *nonbank* lenders. In other words, just as Justice Strong wrote in *Tiffany*, *supra*, 85 U.S. (18 Wall.) 409, 413 [21 L.Ed. at pp. 862, 864], italics added, that "*banking* [not merely *national* banking] could not be carried on" in the face of across-the-board interest rate ceilings that would have made the business of banking itself a losing proposition. The radical policy of prohibiting banks had in fact been adopted in some of the states—Texas (1845), and Iowa and Arkansas (both in 1846), among them—in the not too distant past. (See Hackley, *Our Baffling Banking System* (1966) 52 Va. L.Rev. 565, 570 and fn. 20 (hereafter Hackley); Hammond, Banks and Politics in America (1957) p. 614.)

At this historical distance, it is easy to lose sight of the fact that in 1864 the history of American banking had been one of decades of financial turmoil, cyclical bank "panics," the sudden appearance and disappearance of "wildcat" banks, the absence of a national currency (and of national banks), and volatile, often worthless notes issued by private state-chartered banks. The country's first "central bank," the Bank of the United States, had been destroyed in its second incarnation by President Jackson's veto of its charter renewal in 1832. The following period, roughly from 1836 to 1863, often referred to as the era of "free banking," was one of the most chaotic in American financial history, an era in which all banking was carried on by state chartered banks that issued their own currencies and in which the very idea of banks and bankers came to be distrusted by many Americans.[3] (Hackley, *supra*, 52 Va. L.Rev. at p. 570; Hammond, Banks and Politics in America, *supra*, at pp. 605-622, 725-26; Million, *The Debate on the National Bank Act of 1863*, *supra*, 2 J. of Pol. Economy 251, 261-266.)

---

[3]A vivid sense of what must have seemed the financial chaos surrounding the most everyday affairs of the average citizen can be gained from the observations of a writer in the January 1863 issue of Merchants' Magazine describing the currency of the West as including "the 'shinplasters' of Michigan, the 'wild-cats' of Georgia . . . the 'red-dogs of Indiana and Nebraska, the miserably engraved 'rags' of North Carolina and Kentucky . . . and the not-soon-to-be-forgotten 'stumptail' of Illinois and Wisconsin . . . ." (Quoted in Million, *The Debate on the National Bank Act of 1863* (1894) 2 J. of Pol. Economy 251, 264, fn. 2.) In

The debased currencies of the state banks, together with the federal government's complete withdrawal from the field of financial regulation during the Jackson administration, contributed in the minds of many to the rebellion of the slave-holding states. With enormous sums suddenly and urgently required by the national government to pay its troops and finance the widening war, it is little wonder that Salmon Chase, Lincoln's Treasury Secretary, should call on Congress to enact legislation establishing a uniform national currency to be issued by federally chartered banks. Thus the immediate impetus for the National Bank Act.[4]

Against this backdrop, what Congress likely feared was not that the states would favor their local banks over those holding newly issued federal charters by setting discriminatory interest rates, but that the institution of private commercial banking itself would be abandoned in favor of other forms of lending in a country that, though still in its financial youth, had had much bitter experience with a system that relied on largely unregulated state-chartered banks for its medium of exchange. It was thus to induce state banks to convert their charters and to protect the future of *banking* itself, that Congress tied national bank interest rate ceilings to those set by local legislatures for lenders *other than* state banks.[5]

That linkage, however, gives no support to the majority's argument that Congress must have intended to invest the term "interest" with a meaning that is broader than the text of the statute and legislative materials will

---

an era of ubiquitous Federal Reserve notes, it requires an act of imagination to realize that these characterizations were applied to what at the time passed for money.

[4]To Secretary Chase and others, one of the central objectives of the National Bank Act and allied legislation was the destruction of the state banking system and the assumption of federal control of the nation's banking, a condition that almost came to pass after Congress levied a 10 percent tax on state bank notes in 1865, prompting most of the state banks to convert to federal charters and marking the end of the era of state bank notes. Between 1864 and 1869, the number of state banks fell from a high of 1,089 to a low of 259, while national banks increased from 467 to 1,617. (See Anderson, Federal and State Control of Banking (1934) pp. 72-74; Redford, *Dual Banking: A Case Study in Federalism* (1966) 31 Law & Contemp. Probs. 749, 755.) State banks launched a comeback of sorts over the following decades, primarily because of the increasing importance of banks drafts in lieu of money, eventually achieving a rough equilibrium with their national competitors. It is this historically inadvertent coexistence of state and federally chartered banks in the aftermath of the National Bank Act that has come to be referred to as the "dual" banking system. (See, e.g., Hackley, *supra*, 52 Va. L.Rev. 565, 572.)

[5]As one comment has observed, at the time the *Tiffany* opinion was written, national banks outnumbered state banks by a ratio of seven to one, the latter being in a general state of collapse in the aftermath of the federal impost on their circulating notes. Faced with the impending "nationalization" of banking, "it is not inconceivable that states would enact retaliatory usury laws so that profitable loans could be made only by non-bank lenders." (Comment: *Extension of the Most Favored Lender Doctrine Under Federal Usury Law: A Contrary View* (1982) 27 Vill. L.Rev. 1077, 1085, fn. omitted.)

support. Because Congress's aim in allowing national banks to adopt the highest rate of interest charged by nonbank lenders was not to head off local efforts to destroy national banks by setting discriminatory fees favoring state banks, there is no historical or legal basis for the conclusion that the term " 'interest' in section 30 . . . should be construed to cover late payment fees . . . ." (Maj. opn., *ante*, at p. 153.)

## C

There is another thread prominent in the intellectual fabric of the immediate post-Civil War era that reinforces the view that in its opinion in *Tiffany*, *supra*, 85 U.S. (18 Wall.) 409, the high court had in mind, not discriminatory fee differentials directed at national banks, but the legislative abolition of banks themselves. That is the already well-rooted constitutional doctrine, perhaps then even more vivid in the minds of lawyers and judges than it is today, of federal instrumentalities and their correlative immunity from impairment by state laws. It was, after all, two cases involving the Bank of the United States that Chief Justice Marshall had chosen as the vehicles to establish the proposition that "the bank is an instrument which is 'necessary and proper for carrying into effect the powers vested in the government of the United States' " and was thus immune from state taxation. (*Osborn* v. *Bank of the United States* (1824) 22 U.S. (9 Wheat.) 738, 860 [6 L.Ed. 204, 233]; see also *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 436-437 [4 L.Ed. 579, 609] [". . . this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional."].)

It was only two years after *Tiffany*, *supra*, 85 U.S. (18 Wall.) 409, was decided that the court decided the *Dearing* case (*Farmers'*, *etc. Nat. Bank* v. *Dearing* (1875) 91 U.S. (1 Otto) 29 [23 L.Ed. 196]), reaffirming the view that the privately owned national banks were "instruments designed to be used to aid the government in the administration of an important branch of the public service." (*Id.* at p. 33 [23 L.Ed. at p. 199].) There is thus no doubt whatever that not only Justice Strong and the high court of 1873, but the Congress of 1864, well knew that no state constitutionally could enact measures, like differential rate ceilings, which discriminated against the national banks as fiscal instrumentalities of the national government. Given that widespread recognition in legislative and legal circles, there is simply no warrant for the inference by the majority that Congress must have used the word "interest" in a sense broader than the text will support in order to neutralize state efforts to favor state over federally chartered banks.

## II

The second line of argument anchoring the majority's broadened reading of the word "interest" in section 30 is derived from the comparatively recent decision in *Marquette Nat. Bank* v. *First of Omaha Corp.* (1978) 439 U.S. 299 [58 L.Ed.2d 534, 99 S.Ct. 540] (*Marquette*)—the only high court opinion that speaks to the doctrine of "exportation" as a species of federal preemption. (See maj. opn., *ante*, at pp. 148-149.) Although the majority avoids any express reference to the context in which the case before us arises and to the forces that drive both it and companion litigation across the nation—the recent emergence of truly "interstate" or nationwide banking in the area of consumer financial services—they rely heavily on the high court's reasoning in *Marquette* to support the conclusion that inequalities between late charge ceilings set by California and those allowed Citibank by the South Dakota Legislature have "always been implicit in the structure of the National Bank Act." (Maj. opn., *ante*, at p. 163.) They are "implicit," of course, only if one accepts the flawed reasoning of the majority that when Congress spoke of "interest rates" it really meant something more than that, namely, *non*interest-rate charges, including late payment penalties.

The vice of this reasoning is that neither the high court in *Marquette*, *supra*, 439 U.S. 299, nor the Congress of 1864 wrote or legislated against a backdrop of interstate banking, an arrangement that did not exist even in 1978 and was inconceivable in 1864. Instead, both the *Marquette* court and the Congress that debated and passed the National Bank Act acted against the backdrop of a geographically confined, *intrastate* system that has characterized American banking since the founding of the nation and only now appears to be in a state of rapid disintegration. (See, e.g., Miller, *Interstate Banking in the Court* (1985) Sup. Ct. Rev. 179; Huertas, *The Regulation of Financial Institutions: A Historical Perspective on Current Issues in Financial Services: The Changing Institutions and Government Policy* (Benston edit. 1983) pp. 26-27; Ginsburg, *Interstate Banking, supra*, 9 Hofstra L.Rev. 1133; see also *Bank Regulators Set Interstate Guidelines*, L.A. Times (May 9, 1995) p. C1, col. 6) [state bank regulators disclose new guidelines putting into effect laws allowing interstate banking].)

The opinion in *Marquette, supra*, 439 U.S 299, of course, addressed only the question of interest *rates*; it does not hint at, much less embrace, the Pickwickian notion of "interest" embraced by the majority. Moreover, the high court's statement in *Marquette* that in enacting the National Bank Act, Congress debated the measure "in the context of a developed interstate loan market" (*id.* at p. 317 [58 L.Ed.2d at p. 547]), is of little value to the majority's reasoning. It simply does not follow from the premise of

*Marquette*—that because the Congress of 1864 was aware of the regional nature of the American economy, inequalities in interstate interest rates were implicit in section 30—that Congress must have used the term "interest" in section 30 to include *noninterest-rate* credit terms such as late payment penalties.

Given the system of regional banking that even today continues to be the prevailing pattern, it is evident that in 1864 American banks did not "export" rates across state lines or that they even conceived of doing so. Congress thus could not have legislated with an awareness, however unarticulated, of "true" interstate banking as we are only coming to perceive it, however dimly, today. The pressures that drive the economic behavior of Citibank and like banks (and that lead to class actions such as this one) were unknown to the world of American banking until around 20 years ago. Because the Congress of the Civil War era could not have foreseen such developments, it could not have enacted section 30 of the National Bank Act with the idea of "interest" in mind that the majority attributes to it, that is, one that permits the exportation of credit terms—including late payment penalties—unrelated to interest rates allowed by the exporting bank's home state.

In short, the "exportation" of interest rates is a phenomenon associated with the contemporaneous rise of true interstate banking. There is certainly no hint of it in the *Tiffany* opinion, which deals solely with interest rates in the intrastate context. The word itself, in the context of banking, does not appear in the case law until around the time of the high court's opinion in *Marquette, supra,* 439 U.S. 299, in 1978. (See generally, Clark, The Law of Bank Deposits (3d ed. 1990) § 11.09[2], pp. 11-45 to 11-48.) The result in *Marquette,* although based in part on the conclusion that the Civil War Congress was sensitive to the development of a system of regional banking (439 U.S. at p. 317 [58 L.Ed.2d at p. 547]), does not depend on the entirely retrospective idea that the Congress that enacted section 30 was in any sense aware of the future exfoliation of interstate banking a century and a quarter later, with its manifold pressures to nationalize credit card interest rates and consumer credit terms generally. (See generally, Ginsburg, *Interstate Banking, supra,* 9 Hofstra L.Rev. at p. 1135.)

It is clear, in short, that the majority reads back into the intent of the Civil War Congress an anachronistic awareness of the imperatives of modern interstate banking, an awareness that, because it did not exist at the time, could not have weighed on Congress's collective consciousness. It is equally clear from the historical materials that Congress was concerned with ensuring the survival of the newly established national banks in the context of a banking industry geographically confined within a single state and operating

through single outlets. To thus suggest, as the majority does, that the power of South Dakota to dictate *non*-interest-rate terms to California credit card holders in violation of California law is "implicit" in the word "interest" as it was meant by the framers of the National Bank Act represents an account of the history of American banking that cannot be squared with the reality.

## III

Having relied on the foregoing materials and arguments—the clear and unambiguous text of the statute itself, the tenor of the debate in the Senate, the high court's opinion in *Tiffany, supra*, 85 U.S. (18 Wall.) 409, the bitter national experience against which these events took place, and modern patterns in the nation's banking marketplace—it must be said that, in the end, the truth of none of these matters need be established in order to undermine the majority's conclusion. Because the principle of exportation is a branch of the doctrine of federal preemption, the governing test requires only a showing that the purpose ascribed to Congress by the majority is *less than* "clear and manifest." (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 422, 112 S.Ct. 2608, 2617]; *Mangini* v. *R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1066 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

So solicitous has Congress historically been of the interests of the states in the regulation of banking, both state and federally chartered, that the high court has adopted an especially restrictive standard of preemption by which to judge federal laws that impact state regulation of federal banks. That test, announced by the high court at least a century ago in such cases as *McClellan* v. *Chipman* (1896) 164 U.S. 347 [41 L.Ed. 461, 17 S.Ct. 85], requires the invalidation of a state law *only* where it " 'incapacitates the [national] banks from discharging their duties to the government . . . .' " (*Id.* at p. 357 [41 L.Ed. at p. 465]; see also *Anderson Nat. Bank* v. *Luckett* (1944) 321 U.S. 233, 248 [88 L.Ed. 692, 705, 64 S.Ct. 599, 151 A.L.R. 824] [invalidation only where state laws "infringe the national banking laws or impose an undue burden on the performance of the banks' functions"]; *Lewis* v. *Fidelity Co.* (1934) 292 U.S. 559, 566 [78 L.Ed. 1425, 1431, 54 S.Ct. 848, 92 A.L.R. 794] [subject to state law unless it "interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with a paramount federal law"]; *National Bank* v. *Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [19 L.Ed. 701, 703]; *Davis* v. *Elmira Sav. Bank* (1896) 161 U.S. 275, 283 [40 L.Ed. 700, 701, 16 S.Ct. 502]; see also Scott, *The Patchwork Quilt: State and Federal Roles in Bank Regulation* (1979) 32 Stan. L.Rev. 687, 690-695.)

The preemption test specially applicable to state banking laws as they affect national banks, reflecting as it does a generous deference to state banking laws in the regulation of federally chartered banks, is consistent with the long history of the dual banking system, one feature of which is that "[n]ational banks 'are subject to the laws of the State and are governed in their daily course of business far more by the laws of the State than of the nation.' " (*McClellan* v. *Chipman, supra,* 164 U.S. at pp. 356-357 [41 L.Ed.2d at p. 465], quoting *National Bank* v. *Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [19 L.Ed. 701, 703].) As we said of the dual system in *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503], " '[w]hatever may be the history of federal-state relations in other fields, regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863. . . . In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the courts to delineate the proper boundaries of federal and state supervision. [¶] The judicial test has been a tolerant one. [National banks'] right to contract, collect debts, and acquire and transfer property are all based on state law.' [Citation.] Thus the rule is that state laws apply . . . ." (*Id.* at p. 937, quoting *National State Bank, Elizabeth, N.J.* v. *Long* (3d Cir. 1980) 630 F.2d 981, 985.)

The California statute nominally at issue in this case—section 1671, subdivisions (c) and (d), of the Civil Code—can hardly be said to fail to pass constitutional muster under the governing test. Certainly on the basis of the text of section 30 alone, Congress's intent to displace credit terms other than interest rates applicable to out-of-state national banks is far less than "clear and manifest." Even more pronounced is the failure of Citibank—which bears the burden of demonstrating federal preemption (see *Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 937)—to establish that application of California's ban on late charge fees unrelated to actual damages will in any sense "incapacitate" it from carrying out its duties as a federal instrumentality.

## Conclusion

Professor Geoffrey Miller, an authority on the American banking system and its history, commenting on the revolution sweeping the industry, has observed that "It is sobering, if edifying, to realize that banking, the world's most regulated industry, is evolving in almost blithe disregard of regulatory constraints. The industry has changed through the use of previous dormant statutory powers, through the aggressive manipulation of loopholes, or (sometimes) in apparent disregard of well-established legal principles. But legislators and the regulators have not forced the action. They have been

relegated to cleaning up after the party—closing loopholes, ratifying changes that have occurred extralegally, or removing regulatory constraints in order to allow banks and thrift institutions to survive competition from their unregulated rivals. 'Deregulation' has indeed taken place, but it has not been the result of deliberate policy initiatives on the part of the legislative or executive branches." (Miller, *Interstate Banking in the Court, supra,* 1985 Sup. Ct. Rev. at p. 180.)

It is difficult to imagine a more classic example of this diagnosis than the case before us. Late payment charges exacted by credit card issuing banks totaled almost $2 billion in 1992, according to one industry source. (Credit Card News (Apr. 1, 1994) at p. 2.) A large part of this revenue, from what one authority has called the "massive interstate credit card exportation phenomenon," has gone to Citibank, easily the dominant credit card issuer in the interstate market, by exploiting what can only be called a loophole in the interstices of federal-state banking regulation. (See Burgess & Ciolfi, *Exportation or Exploitation? A State Regulator's View of Interstate Credit Card Transactions, supra,* 42 Bus. Law. at p. 936; see also the study, General Accounting Office, U.S. Credit Card Industry: Competitive Developments Need to be Closely Monitored (Apr. 1994) p. 27 [Citibank is the single largest issuer of Visa and Mastercard with over $35 billion in billings.].)

However valuable to the economy of South Dakota, that scheme is in derogation of the right of the California Legislature to ensure the welfare of its residents in their credit dealings, more or less as it sees fit. To paraphrase the high court's opinion in *Marquette, supra,* 439 U.S. at page 319 [58 L.Ed.2d at page 548], "any plea to alter § [30] . . . is better addressed to the wisdom of Congress than to the judgment of this Court." It is not for us to condone an evasion of California's laws or the primacy of its lawmaking powers by the judicial legerdemain embraced by the majority.

**GEORGE, J.**—I respectfully dissent.

The question before us is whether federal law precludes California from applying its state consumer protection laws to *late payment charges* imposed upon California consumers by a national bank that is chartered in another state but is doing business in California. As I shall explain, I believe that the majority, in concluding that federal law prohibits the application of California law to such late payment charges, has failed to recognize the clear distinction that traditionally has been drawn between such late payment charges and charges that commonly are characterized as "interest."

I

In analyzing the question before us, it is helpful to begin by placing the matter in perspective. As a general rule, of course, out-of-state corporations that conduct business in California ordinarily are subject to this state's consumer protection laws. (See, e.g., *California* v. *ARC America Corp.* (1989) 490 U.S. 93, 101 [104 L.Ed.2d 86, 94, 109 S.Ct. 1661].) Furthermore, although Congress clearly possesses the authority to exempt nationally chartered banks from the general operation of state law, as we explained in *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503], "Congress has declined to provide an entire system of federal law to govern every aspect of national bank operations . . . [and] national banks have traditionally been 'governed in their daily course of business far more by the laws of the State than of the [n]ation. . . .' " (Quoting *National Bank* v. *Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [19 L.Ed. 701, 703]; see also *McClellan* v. *Chipman* (1896) 164 U.S. 347, 357 [41 L.Ed. 461, 465, 17 S.Ct. 85]; *Anderson Nat. Bank* v. *Luckett* (1944) 321 U.S. 233, 248 [88 L.Ed. 692, 705-706, 64 S.Ct. 599, 151 A.L.R. 824].) Thus, in the *Perdue* decision itself, we held that California properly could apply its state consumer protection laws in determining the validity of fees imposed by the defendant national bank for the processing of "bounced" or "NSF" checks (i.e., checks drawn on accounts with insufficient funds).

Although, as *Perdue* demonstrates, it is well established that federal law does not broadly preempt states from applying state law to the operations of national banks, at the same time it is quite clear that, under the federal statute at issue in this case, 12 U.S.C. § 85 (hereafter section 85), the *rate of interest* that may be charged on loaned funds is a subject as to which California may not apply its own state law in evaluating the validity of the actions of defendant Citibank. In *Marquette Nat. Bank* v. *First of Omaha Corp.* (1978) 439 U.S. 299 [58 L.Ed.2d 534, 99 S.Ct. 540], the United States Supreme Court held that the State of Minnesota could not apply its own state law limits on the rate of interest (that could be charged on consumer credit card accounts) to a national bank whose home state was Nebraska. The high court concluded that, under section 85, the Nebraska national bank was entitled to impose a rate of interest authorized by Nebraska law even in its dealings with Minnesota residents. Thus, under the *Marquette* decision, it is clear that, because defendant Citibank is a national bank whose home state is South Dakota, California may not apply the limits on interest rates embodied in California law to restrict the rate of interest Citibank charges California consumers on their Citibank credit card accounts.

The *Marquette* decision, however, involved only the question of interest rates and did not address the issue whether section 85 applies to the type of

late payment fees at issue in the present case. As I shall explain, I believe that section 85, read as a whole and according to the ordinary meaning of its terms, does not support the majority's conclusion that the late payment charges here at issue constitute "interest" within the meaning of that statute.

## II

Section 85 provides in relevant part: "Any [national bank] may take, receive, reserve and charge on any loan or discount made . . . *interest at the rate* allowed by the laws of the State . . . where the bank is located, or *at a rate* of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank . . . , whichever may be the greater, and no more . . . . When *no rate* is fixed by the laws of the State . . . the bank may . . . charge *a rate* not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank . . . , whichever may be the greater . . . ." (Italics added.)

Section 85 includes no special definition of the term "interest" as used in the statute, and no indication that the term was used in other than its ordinary and commonly understood sense. As numerous cases have recognized, a late payment charge that is set at a fixed-dollar amount unrelated either to the amount of the loan or the time period for which funds are advanced, and that is assessed only if the borrower fails timely to make a required payment, ordinarily is not considered "interest." (See, e.g., *Tackett* v. *First Sav. of Arkansas, F.A.* (1991) 306 Ark. 158 [810 S.W.2d 927, 931-932]; *Rangen, Inc.* v. *Valley Trout Farms, Inc.* (1983) 104 Idaho 284 [658 P.2d 955, 957-960]; *Barbour* v. *Handlos Real Est. and Bldg. Corp.* (1986) 152 Mich.App. 174 [393 N.W.2d 581, 587] [$15 late payment fee "do[es] not constitute interest"].) Unlike a loan origination fee or other charge that is imposed by a lender without regard to the subsequent conduct of the borrower and that ordinarily would be included in calculating the "effective" rate of interest at which a loan is made, a late payment fee that is assessed if, and only if, the borrower fails to make a timely payment during the period of the loan, properly is viewed as either a "penalty" or as "liquidated damages," imposed upon the basis of conduct that is within the control of the borrower. (See, e.g., *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 735-742 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R..3d 39] [holding that a late charge in a home loan contract does not constitute interest but, instead, reasonably must be viewed as either a penalty or liquidated damages].) Such a conditional or contingent late payment charge or assessment traditionally has been distinguished from interest for purposes of determining whether a loan has been made at a rate in excess of the

permitted rate of interest. (See, e.g., *First American Title Ins. & Trust Co.* v. *Cook* (1970) 12 Cal.App.3d 592, 596-597 [90 Cal.Rptr. 645] [holding that $5 late charge could not be regarded as interest on a loan for the purpose of determining whether the loan was usurious: "Whether a transaction is usurious must be determined as of the time of the transaction. An agreement which is not usurious in its inception cannot become so by reason of the borrower's subsequent default. [Citations.] The penalty provisions to which Cook now objects come into play only in the event of his default. Such payments are not regarded as interest on the loan itself, but as a penalty for nonperformance of a legitimate agreement. [Citation.]"]; *Fox* v. *Federated Department Stores, Inc.* (1979) 94 Cal.App.3d 867, 884 [156 Cal.Rptr. 893] [holding that late payment finance charge on credit card account is not usurious: "Since the contract at its inception does not require a usurious payment, and it is only because of the customer's voluntary act in failing to make the payment when due that a finance charge is levied, under the applicable law such charge cannot be usurious."].)

There is absolutely nothing in section 85 that suggests that Congress, when it enacted this provision in 1864, intended the statutory reference to "interest" to include the type of late payment fee at issue in the present case. Indeed, at the time of the 1864 enactment, the leading United States Supreme Court decisions on the subject made it quite clear that such a late payment charge, whose payment was contingent upon the borrower's own conduct during the term of the loan, would *not* be considered interest for the purpose of determining whether the loan exceeded the legally permitted rate of interest. (See *Spain* v. *Hamilton's Administrator* (1863) 68 U.S. (1 Wall.) 604, 626 [17 L.Ed. 619, 625] ["*The payment of anything additional depends also upon a contingency, and not upon any happening of a certain event, which of itself would be deemed insufficient to make a loan usurious.*" (Italics added.)]; *Lloyd* v. *Scott* (1830) 29 U.S. (4 Pet.) 205, 226 [7 L.Ed. 833, 840] ["If a party agree to pay a specific sum, exceeding the lawful interest, provided he do not pay the principal by a day certain, *it is not usury. By a punctual payment of the principal, he may avoid the payment of the sum stated, which is considered as a penalty.*" (Italics added.)].) Although the majority cites a few, isolated pre-1864 cases that held that, under some circumstances, such charges might be viewed as rendering a loan usurious (see maj. opn., *ante*, at pp. 152-153), the very annotation cited by the majority states explicitly and unequivocally that "the general rule" at that time (and thereafter) was to the contrary, and corresponded to the above quoted statements of the United States Supreme Court in the *Spain, supra*, 68 U.S. (1 Wall.) 604, and *Lloyd, supra*, 29 U.S. (4 Pet.) 205, decisions. (See Annot. (1933) 82 A.L.R. 1213, 1214.) Under these circumstances, I believe it is unreasonable for the majority to conclude that, when enacted, the term

"interest," as employed in section 85, was intended to encompass the late payment charges here at issue.[1]

## III

The majority maintains, however, that the term "interest" in section 85 must be given an unusually broad interpretation, encompassing late payment fees, in order to effectuate the legislative purpose of the statute. It reasons: "If 'interest' were not read as indicated above, the purpose of facilitating a national banking system by granting national banks 'most favored lender' status in their home states could be frustrated by unfriendly state legislation. Thus, a state could allow periodic percentage charges payable absolutely by maturity for all lenders, *including national banks*, but fix them at a rate so low that they could lend only at a loss. It might then allow late payment fees to some lenders, *not including national banks*, at a level high enough that *they* could lend at a profit. Such a result would be untenable." (Maj. opn., *ante,* at p. 154, original italics, fn. omitted.)

In my view, the foregoing reasoning of the majority is flawed in two distinct respects. First, I do not believe it is accurate to suggest that if section 85's reference to "interest" were interpreted *not* to include late payment

---

[1]Although the majority acknowledges that the *Spain* v. *Hamilton's Administrator, supra,* 68 U.S. (1 Wall.) 604, and *Lloyd* v. *Scott, supra,* 29 U.S. (4 Pet.) 205, decisions indicate that a late payment charge generally would not be considered in determining whether a lender had charged a usurious rate of interest, the majority suggests that those decisions are not inconsistent with its interpretation of section 85 because they do not indicate that a late-payment fee should not be considered "interest," but rather simply indicate that a late-payment fee should not be considered "unlawful interest." (Maj. opn., *ante,* p. 153, fn. 8.) I believe the majority's suggestion reflects an unreasonable interpretation of the word "interest" as used in section 85. In my view, in providing in section 85 that a national bank may charge on any loan "interest at the rate allowed by the laws of the State . . . where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank . . . , whichever [is] greater," Congress clearly was referring to those charges imposed by a national bank that were subject to and limited by laws establishing legal "rates of interest," and was not referring to other charges or fees that generally were not subject to the legal limitations imposed upon interest rates.

The conclusion that the term "interest," as employed in section 85, should not be interpreted to encompass late payment charges is further supported by the circumstance that other federal statutes and regulations draw a clear distinction between interest and late payment charges or fees. (See, e.g., 12 C.F.R. §§ 226.4(b)(1), 226.4(c)(2) (1995), implementing 15 U.S.C. § 1605(a)(1) [under federal Truth in Lending Act, "finance charge" includes "interest" but excludes "[c]harges for actual unanticipated late payment"]; 12 C.F.R. § 590.3 (1995), implementing 12 U.S.C. § 1735f-7a [with respect to federally related mortgage loans, state laws "expressly limiting the rate or amount of interest . . . shall not apply," but "[n]othing in this section preempts limitation in state laws on . . . late charges . . . ."]. See also *Seiter* v. *Veytia* (Tex. 1988) 756 S.W.2d 303 [federal statute eliminating interest rate limitations on loans secured by first liens on residential real property did not include late charges, and thus federal statute did not preempt application of state law to such late charges].)

charges, a home state would be free to discriminate against national banks with regard to the imposition of such late fees. It has been quite well settled, since the early 1800's, that—even in the absence of a specific federal statutory prohibition—a state may *not* discriminate against a "federal instrumentality" either in the enactment or the enforcement of state laws, and a national bank is, of course, a federal instrumentality. (See *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316 [4 L.Ed. 579]; *Farmers', etc. Nat. Bank* v. *Dearing* (1875) 91 U.S. (1 Otto) 29 [23 L.Ed. 196]; *Memphis Bank & Trust Co.* v. *Garner* (1983) 459 U.S. 392, 397 [74 L.Ed.2d 562, 567, 103 S.Ct. 692].)

Furthermore, if, absent the application of section 85, a home state lawfully *could* discriminate against a national bank (vis-à-vis its local state banks or other lenders) and desired to do so, a state would be able to discriminate with regard to a great variety of matters—from building permits to minimum wages to health and safety requirements—and yet no one reasonably could maintain that all of these matters should be characterized as "interest," within the meaning of section 85, simply because they are susceptible to discriminatory application. Thus, even if a state theoretically would be free (apart from section 85) to discriminate against a national bank with regard to late payment charges—a proposition I do not accept—that circumstance still would provide no logical basis for characterizing such charges as "interest" within the meaning of section 85.

Accordingly, I believe the majority has failed to demonstrate that the legislative purpose of section 85 justifies a departure from the ordinary reading of the statutory term "interest."[2]

## IV

In sum, I conclude that the word "interest," as employed in section 85, cannot properly be interpreted to apply to the late payment charges at issue in this case. Of course, if Congress determines, as a matter of policy, that the validity of late payment charges imposed by a national bank should be

---

[2]I recognize that the majority's expansive interpretation of the word "interest," as employed in section 85, follows the lead of a number of lower federal and sister-state courts. (See maj. opn., *ante*, at p. 156.) In *Greenwood Trust Co.* v. *Com. of Mass.* (1st Cir. 1992) 971 F.2d 818, perhaps the leading case in this line of decisions, the court relied upon a number of prior cases broadly interpreting section 85 to apply to a variety of bank charges or fees other than late payment fees, and did not consider specifically whether, when the predecessor to section 85 was enacted in 1864, the statutory reference to "interest" was intended to encompass late payment fees, as contrasted with the many other possible types of bank charges. (See 971 F.2d at pp. 829-830.) In any event, to the extent that prior decisions conclude that the term "interest," as employed in section 85, was intended to refer to such late payment charges, I respectfully disagree for the reasons set out above.

determined by the law of the national bank's home state, it may extend section 85 to reach such late payment charges. As currently written, however, I believe that the statute does not apply to such charges.

For the foregoing reasons, I would reverse the judgment of the Court of Appeal and permit plaintiff's action to go forward.

The United States Supreme Court granted a petition for a writ of certiorari on January 19, 1996 (No. 95-860). The United States Supreme Court affirmed the decision of the California Supreme Court on June 3, 1996.