WERDEGAR, J.
I dissent. Defendant Bayer Corporation (Bayer) manufactured and placed into the stream of our nation’s commerce chemical products that it (and the other defendants) represented were effective in destroying certain insect pests. Plaintiffs believed these assurances and applied the product to their orchards, allegedly causing thousands of dollars worth of damage. Plaintiffs then sought compensation for this damage to their property under legal doctrines long established in this state. In concluding plaintiffs are no longer entitled to seek this relief in our courts due to the asserted preemptive effect of federal legislation, the majority discerns an expression of congressional intent to deprive plaintiffs of their historic legal remedies that I do not perceive. In so doing, the majority not only misapplies the latest United States Supreme Court decision in this area of the law, but, more importantly, fails to heed the most basic and important rule governing questions of federal preemption of state law: when Congress intends to displace state law, it must express that intent clearly. Finding no such clear statement of congressional purpose, I conclude state tort law is not preempted in this case. Because the majority finds otherwise, I dissent.
I
Plaintiffs, owners of commercial walnut orchards, sought to use a pesticide to protect their crop against insect pests. They spoke to defendant Paul Osterlie, an employee of defendant Tri-Ag Service, Inc., who recommended the combined application of Guthion and Morestan mixed in water in certain proportions. Guthion and Morestan are insecticides manufactured by defendant Bayer. Because the insecticides did not dissolve well in water, Osterlie recommended that a chemical surfactant be added to the mixture to facilitate solubility (to permit the mixture to be sprayed on the trees). Plaintiffs followed Osterlie’s recommendations, allegedly resulting in $150,000 damage to their walnut crop. Plaintiffs allege the chemical surfactant, alone or in *341 combination with the insecticides, tended to dissolve the waxy surface of the leaves, causing them to wither.[1]
Plaintiffs sued Osterlie, Tri-Ag Service, Inc., and Bayer, alleging: (1) negligence; (2) strict liability for ultrahazardous activity; (3) negligence per se; (4) products liability; (5) breach of implied warranty; (6) misrepresentation; and (7) trespass. Defendants moved for summary judgment, claiming (among other things) that all causes of action were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 United States Code section 136 et seq. (hereafter FIFRA). The trial court agreed and granted summary judgment. In a split decision, the Court of Appeal reversed.
II
I begin with the basic rules governing questions of preemption. Of course, where state law directly conflicts with federal law, the federal law controls, for “the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.” (U.S. Const., art. VI, cl. 2.) Because we are concerned in this case with an express preemption provision (7 U.S.C. § 136v(b)), we may assume Congress intended to preempt some state law. Our task, then, is to determine the scope of that preemption. “Although our analysis of the scope of the pre-emption statute must begin with its text, see Gade v. National Solid Wastes Management Assn., 505 U.S. 88, 111 [112 S.Ct. 2374, 2389-2390, 120 L.Ed.2d 73] (1992) (Kennedy, J., concurring in part and concurring in judgment), our interpretation of that language does not occur in a contextual vacuum. Rather that interpretation is informed by two presumptions about the nature of pre-emption.” (Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 484-485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700] (Medtronic).)
First, and most importantly, proper appreciation of the states as independent sovereigns in our federal system demands that we presume Congress did not intend to displace the historic police powers of the states unless such intent is both “clear and manifest.” (Rice v. Santa Fe Elevator Corp. (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447], quoted in Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407] (Cipollone).) The United States Supreme Court has “long presumed that Congress does not cavalierly pre-empt state-law causes of action” (Medtronic, supra, 518 U.S. at p. 485 [116 S.Ct. at p. 2250]), stating *342 that “we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. [Citation.]” (New York State Conference of Blue Cross & Blue Shield, Plans v. Travelers Ins. Co. (1995) 514 U.S. 645, 654-655 [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695].)
This presumption against preemption acknowledges the role states historically have played, exercising their police powers to protect the health and safety of their residents. Because the federal government is a relative latecomer in the area of protecting public safety, courts should be cautious in concluding federal law supplants state law, lest the public be left without protection in matters of health and safety. We recently have recognized this rebuttable presumption against federal preemption of state law. (Peatros v. Bank of America (2000) 22 Cal.4th 147, 157 [91 Cal.Rptr.2d 659, 990 P.2d 539] (plur. opn.); Smiley v. Citibank (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690], affd. (1996) 517 U.S. 735 [116 S.Ct. 1730, 135 L.Ed.2d 25].)
The United States Supreme Court, moreover, has recently applied this presumption against preemption in the context of interpreting FIFRA, concluding that congressional intent to supplant state and local regulatory authority was not sufficiently “clear and manifest” in FIFRA to justify a finding of preemption. (Wisconsin Public Intervenor v. Mortier (1991) 501 U.S. 597, 607, 611 [111 S.Ct. 2476, 2482-2485, 115 L.Ed.2d 532] (Mortier) [FIFRA does not preempt regulation of pesticides by town ordinance].) Similarly, we also have applied the presumption against preemption when interpreting FIFRA, noting that “in the absence of a clear manifestation of intention to preclude state regulation in an area traditionally regulated by the exercise of state . . . police powers, it will not be presumed that a federal statute was intended to supersede such powers.” (People ex rel. Deukmejian v. County of Mendocino (1984) 36 Cal.3d 476, 492 [204 Cal.Rptr. 897, 683 P.2d 1150] [FIFRA does not preclude states from authorizing local governmental entities to enact and enforce restrictive pesticide regulations].)
The second presumption or rule we must apply is that the question of preemption “fundamentally is a question of congressional intent.” (English v. General Electric Co. (1990) 496 U.S. 72, 79 [110 S.Ct. 2270, 2275, 110 L.Ed.2d 65], quoted in Smiley v. Citibank, supra, 11 Cal.4th at p. 147.) “ ‘[T]he purpose of Congress is the ultimate touchstone’ in every preemption case.” (Medtronic, supra, 518 U.S. at p. 485 [116 S.Ct. at p. 2250], quoting Retail Clerks v. Schermerhom (1963) 375 U.S. 96, 103 [84 S.Ct. 219, 222, 11 L.Ed.2d 179]; see also Cipollone, supra, 505 U.S. atp. 516 [112 *343 S.Ct. at p. 2617].) “Congress’ intent . . . primarily is discerned from the language of the pre-emption statute and the ‘statutory framework’ surrounding it. [Citation.] Also relevant, however, is the ‘structure and purpose of the statute as a whole,’ [citation], as revealed not only in the text, but through the reviewing court’s reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.” (Medtronic, supra, 518 U.S. at p. 486 [116 S.Ct. at pp. 2250-2251].) We recently have recognized the primacy of Congress’s intent when deciding preemption questions. (Peatros v. Bank of America, supra, 22 Cal.4th at p. 157 (plur. opn.); Smiley v. Citibank, supra, 11 Cal.4th at p. 147.)
With this basic interpretive framework in mind, I turn to whether FIFRA preempts state common law causes of action.
III
The FIFRA preemption provision, 7 United States Code section 136v(b) (hereafter section 136v(b)), provides: “[A] State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.” We choose in this case between two competing interpretations of the word “requirements,” as used in the statutory preemption provision. On the one hand, “requirements” could mean only positive enactments of law, such as statutes enacted by our Legislature and administrative regulations promulgated by an appropriate state agency. On the other hand, the word “requirements” could encompass both positive enactments of law as well as common law tort actions based on a failure to warn, on the theory that such actions constitute “requirements for labeling.” The majority adopts this latter interpretation. As I explain, it is mistaken.
To begin with, either meaning admittedly is possible. A “requirement[] for labeling or packaging” most certainly includes all positive enactments of law, but it could also include common law claims for damages, the success of which could have the indirect effect of encouraging manufacturers to alter their labeling or packaging and thus allow the state to indirectly regulate labeling. The pertinent inquiry is whether the words of section 136v(b) clearly embrace the latter, broader interpretation. To that, one would have to answer in the negative. At best, FIFRA’s preemption provision is ambiguous. Such ambiguity weighs in favor of interpreting section 136v(b) to have a narrow, rather than a broad, preemptive effect. (See Medtronic, supra, 518 U.S. at p. 489 [116 S.Ct. at p. 2252] (plur. opn. of Stevens, J.) [because of “ambiguities in the statute,” the Medical Devices Amendments of 1976 *344 (MDA) should be interpreted as not preempting state law]; id. at p. 505 [116 S.Ct. at p. 2260] (conc. opn. of Breyer, J.) [that the MDA’s preemption provision “is highly ambiguous” is a factor against preemption].) To reiterate, the presumption is against preemption, and Congress’s intent to supplant state law must be “clear and manifest.” (Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at p. 230 [67 S.Ct. at p. 1152].)
The majority responds that “[w]hen Congress intends to preempt state regulatory authority but to leave common law actions intact, it knows how to accomplish that,” citing language in the Comprehensive Smokeless Tobacco Health Education Act of 1986 providing that “[n]othing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person.” (Maj. opn., ante, at p. 328, quoting 15 U.S.C. § 4406(c), italics added.) The majority thus suggests that because FIFRA does not expressly leave state tort law intact, we should infer Congress intended to override it. Such reasoning is flawed for two reasons. First, its premise—that Congress would have expressly left state tort law intact if that had been its intent—-is not necessarily true. Rather, Congress expresses its intent in various ways. For example, Congress sometimes indicates its preemptive intent not by silence, as the majority would have it, but by expressly stating a federal law will override a state’s common law. (See, e.g., 12 U.S.C. § 1715z-17(d) [providing that rules for certain mortgage insurance “shall not be subject to any State constitution, statute, court decree, common law, rule, or public policy limiting or prohibiting increases in the outstanding loan balance after execution of the mortgage” (italics added)].) That we may draw much meaning from Congress’s failure to mention state tort law in section 136v(b) is therefore doubtful.
A second and more basic flaw in the majority’s reasoning is that it ignores the fundamental rule governing preemption of state law. To reiterate, the presumption is against preemption, and Congress’s intent to supplant state law must be “clear and manifest.” (Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at p. 230 [67 S.Ct. at p. 1152].) Any attempt to infer Congress’s intent from its statutory silence is thus improper. (See Mortier, supra, 501 U.S. at p. 607 [111 S.Ct. at p. 2483] [noting, in a FIFRA case, that “Mere silence . . . cannot suffice to establish a ‘clear and manifest purpose’ to pre-empt local authority”].)
More profitable than attempting to divine Congress’s intent from its silence is to examine what Congress actually has said. Returning to the actual words of FIFRA, we find that Congress has supplied some affirmative indication of its intent regarding the scope of FIFRA’s preemption. The statutory provision immediately preceding FIFRA’s preemption provision *345 states: “A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.” (7 U.S.C. § 136v(a), hereafter section 136v(a).) Thus, short of permitting the sale of a substance FIFRA has banned, Congress has affirmatively and specifically preserved the power of the states to regulate pesticides. Indeed, our high court has held that FIFRA “leaves ample room for States and localities to supplement federal [regulatory] efforts even absent the express regulatory authorization of § 136v(a).” (Mortier, supra, 501 U.S. at p. 613 [111 S.Ct. at p. 2486].)
Because Congress, in the statutory provision immediately preceding the preemption provision, expressly affirmed the power of the states to regulate pesticides, to view FIFRA as an overarching federal regulatory scheme intended to supplant all or even most state regulation is inaccurate. Instead, its goals are more modest. (See Mortier, supra, 501 U.S. 597 [FIFRA held not to preempt pesticide regulation by local town, because language of FIFRA does not explicitly preempt local regulation, Congress’s intent is ambiguous, and FIFRA language shows no clear and manifest indication of congressional intent to preempt].) Reading FIFRA’s preemption clause in conjunction with section 136v(a) reveals Congress’s intent that the scope of FIFRA’s preemption of state law should be limited in nature. The majority’s failure to appreciate the significance of section 136v(a) as a critical indicator of Congress’s intent thus undercuts its analysis.
The majority, adopting the view of the lower federal appellate courts,[2] finds Cipollone, supra, 505 U.S. 504, applicable here. (Maj. opn., ante, at p. 323 et seq.) In Cipollone, the high court did not address the meaning of FIFRA, but instead considered the proper interpretation of section 5(b) of the Public Health Cigarette Smoking Act of 1969 (hereafter the 1969 Cigarette Act). (Pub.L. No. 91-222 (Apr. 1, 1970) 84 Stat. 87, codified at 15 U.S.C. § 1331 et seq.) In explaining the scope of the 1969 Cigarette Act, the high court found the phrase “No requirement or prohibition based on smoking and *346 health . . . with respect to the advertising or promotion of any cigarettes” to have broad preemptive effect, supplanting state common law causes of action for injuries caused by smoking. “The phrase ‘[n]o requirement or prohibition’ sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules.” (Cipollone, supra, 505 U.S. at p. 521 [112 S.Ct. at p. 2620] (plur. opn. of Stevens, J.).) Finding “ ‘no notable difference between the language in the 1969 Cigarette Act and the language in FIFRA’ ” (maj. opn., ante, at p. 324, quoting Taylor AG Industries v. Pure-Gro (9th Cir. 1995) 54 F.3d 555, 559), the majority then applies Cipollone’& reasoning to the present case and concludes FIFRA preempts state common law.
With due respect to both the majority and the several federal appellate courts that have reached the same result (see, e.g., Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 560; Worm v. American Cyanamid Co. (4th Cir. 1993) 5 F.3d 744, 747), the two situations are not comparable. First and foremost, the preemption provision of the 1969 Cigarette Act is not prefaced with a provision specifically affirming the power of the states to regulate in its subject area of “smoking and health.” Section 136v(b), by contrast, is so prefaced: section 136v(a) explicitly recognizes the power of the states to “regulate the sale or use of any federally registered pesticide or device in the State . . . .” (7 U.S.C. § 136v(a).) As explained above, section 136v(a) is critically important in interpreting FIFRA’s preemptive scope.
Faced with an express statement by Congress retaining the states’ regulatory power, and in the absence of a “clear and manifest” expression of congressional intent to supplant the common law of the states, to maintain, as does the majority, that state tort law must be preempted because a successful tort lawsuit will “indirectly” affect pesticide labeling and packaging is untenable. Such indirect pressure on manufacturers to alter their pesticide labels is not embraced within the scope of FIFRA. For example, a state may, pursuant to section 136v(a), ban outright the use of an insecticide for which the Environmental Protection Agency (EPA) has approved a label pursuant to FIFRA. Although such direct state regulation would, of course, have the indirect effect of encouraging the manufacturer to change its label (e.g., “Not valid for use in California”), such indirect pressure on a manufacturer would nevertheless seem to be permissible. Indeed, what other meaning could section 136v(a) have?
Moreover, as the majority admits (maj. opn., ante, at p. 336), common law causes of action based on other than a failure-to-wam theory are not preempted by FIFRA. (See, e.g., Worm v. American Cyanamid Co., supra, 5 *347 F.3d at p. 747 [in a FIFRA case, “[c]laims for negligent testing, manufacturing, and formulating, on the other hand, are not preempted”]; Lyall v. Leslie's Poolmart (E.D.Mich. 1997) 984 F.Supp. 587 [same for claims of negligent design and manufacturing]; Higgins v. Monsanto Co. (N.D.N.Y. 1994) 862 F.Supp. 751 [claim of strict liability based on design defect and express warranty]; Ackerman v. American Cyanamid Co. (Iowa 1998) 586 N.W.2d 208 [586 N.W.2d 208] [claims of negligent design and testing]; see also Kawamata Farms v. United Agri Products (1997) 86 Hawaii 214 [948 P.2d 1055] [negligence, as well as strict liability and express warranty claims].) If plaintiffs, therefore, are successful in proving liability based on, e.g., negligent manufacture and testing, or negligently recommending a combination of Guthion and Morestan in conjunction with chemical surfactants, such litigation success could, of course, have the practical effect of convincing the manufacturer of these chemicals to change the labels so as to warn of the possibility of phytotoxicity to emergent growth of nut trees, especially when used with chemicals that promote solubility.
The majority’s interpretation of FIFRA thus leads to this conundrum: A state may directly regulate pesticides pursuant to section 136v(a)—even to the point of banning their use—through statutes or administrative regulations (so long as the state does not require labeling inconsistent with what the EPA has approved), even if such regulation has the indirect effect of encouraging manufacturers to alter their labels, but a state may not indirectly regulate pesticides by permitting tort suits at common law for damages, for the very same reason that such regulation has the indirect effect of encouraging manufacturers to alter their labels. This makes so little sense that the majority must be mistaken in concluding FIFRA preempts common law tort actions.
A second reason why reliance on Cipollone, supra, 505 U.S. 504, is unjustified is that case’s unwarranted focus on the word “requirement,” a term common to both section 136v(b) as well as the preemption provision in the 1969 Cigarette Act. The majority, following the views of the lower federal appellate courts, essentially concludes that the broad definition of the word “requirement,” as that term is used in section 5(b) of the 1969 Cigarette Act and interpreted in Cipollone, supra, 505 U.S. 504, requires we interpret the same word in section 136v(b) to have a similarly broad effect. (See, e.g., maj. opn., ante, at p. 325.) The word “requirement,” however, is not some type of “preemption litmus paper.” Instead, we must look beyond superficial semantic similarities to determine what Congress actually intended under the particular circumstances.
Illustrative of this point is the high court’s decision in Medtronic, supra, 518 U.S. 470, a case that postdates Cipollone, supra, 505 U.S. 504. In *348 Medtronic, the defendant contended the MDA preempted the plaintiffs’ claim that the defendant negligently designed a pacemaker. The relevant statute, 21 United States Code section 360k(a), provides that “no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement— [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.” (Italics added.)
One could conclude that the use of the word “requirement” in the MDA must mean the same thing as in the 1969 Cigarette Act, and thus the MDA must preempt state common law causes of action. This was, in fact, the precise argument of the defendant in Medtronic: “Medtronic suggests that any common-law cause of action is a ‘requirement’ which alters incentives and imposes duties ‘different from, or in addition to,’ the generic federal standards that the [Federal Drug Administration] has promulgated in response to mandates under the MDA. In essence, the company argues that the plain language of the statute pre-empts any and all common-law claims brought by an injured plaintiff against a manufacturer of medical devices.” (Medtronic, supra, 518 U.S. at p. 486 [116 S.Ct. at p. 2251] (plur. opn. of Stevens, J.).)
The Supreme Court disagreed, finding the argument “not only unpersuasive,” but “implausible” (Medtronic, supra, 518 U.S. at p. 487 [116 S.Ct. at p. 2251] (plur. opn. of Stevens, J.); see also id. at p. 505 [116 S.Ct. at p. 2260] (conc. opn. of Breyer, J.) [agreeing the MDA does not preempt state common law causes of action]), and its discussion of the issue is illuminating. “Under Medtronic’s view of the statute, Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device. Moreover, because there is no explicit private cause of action against manufacturers contained in the MDA, and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective medical devices. Medtronic’s construction of § 360k would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order ‘to provide for the safety and effectiveness of medical devices intended for human use,’ 90 Stat. 539 (preamble to Act). It is, to say the least, ‘difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct,’ Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251 [104 S.Ct. 615, 623, 78 L.Ed.2d 443] (1984), and it would take language *349 much plainer than the text of § 360k to convince us that Congress intended that result.
“Furthermore, if Congress intended to preclude all common-law causes of action, it chose a singularly odd word with which to do it. The statute would have achieved an identical result, for instance, if it had precluded any ‘remedy’ under state law relating to medical devices. ‘Requirement’ appears to presume that the State is imposing a specific duty upon the manufacturer, and although we have on prior occasions concluded that a statute preempting certain state ‘requirements’ could also pre-empt common-law damages claims, see Cipollone, 505 U.S., at 521-522 [112 S.Ct. at p. 2620] (opinion of Stevens, J.), that statute did not sweep nearly as broadly as Medtronic would have us believe that this statute does.
“The pre-emptive statute in Cipollone was targeted at a limited set of state requirements—those ‘based on smoking and health’—and then only at a limited subset of the possible applications of those requirements—those involving the ‘advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of’ the federal statute. See id., at 515 [521 U.S. at pp. 2616-2617]. In that context, giving the term ‘requirement’ its widest reasonable meaning did not have nearly the preemptive scope nor the effect on potential remedies that Medtronic’s broad reading of the term would have in this suit. The Court in Cipollone held that the petitioner in that case was able to maintain some common-law actions using theories of the case that did not run afoul of the pre-emption statute. See id., at 524-530 [112 S.Ct. at pp. 2621-2624]. Here, however, Medtronic’s sweeping interpretation of the statute would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for the Lohrs’ alleged injuries. Given the ambiguities in the statute and the scope of the preclusion that would occur otherwise, we cannot accept Medtronic’s argument that by using the term ‘requirement, ’ Congress clearly signaled its intent to deprive States of any role in protecting consumers from the dangers inherent in many medical devices.” (Medtronic, supra, 518 U.S. at pp. 487-489 [116 S.Ct. at pp. 2251-2252] (plur. opn. of Stevens, J.), fns. omitted, italics added; see also id. at pp. 505-508 [116 S.Ct. at pp. 2260-2261] (cone. opn. of Breyer, J.) [agreeing the MDA does not preempt state tort law].)
This same reluctance to ascribe to Congress an unstated intention to deprive consumers of their historic protection under this state’s common law is applicable to the determination of the scope of FIFRA’s preemptive effect. According to the majority, Congress intended to eliminate from all 50 states *350 lawsuits that are based on a defendant’s common law duty to warn of the dangers of a product it has placed into the stream of commerce. This historic ability of persons to gain redress for injuries caused by defective products is not replaced by creation of a federal cause of action. Instead, consumers are left with this meager “remedy”: they may complain to the administrator of the EPA that the label on the pesticide is inadequate and the manufacturer should be made to change it. As the high court concluded in Medtronic, supra, 518 U.S. 470, with regard to the preemptive effect of the MDA, so too here it is implausible that Congress, through the use of such ambiguous statutory language, intended FIERA to effect this .sweeping change in the manner in which injured persons can gain compensation for their injuries. That FIFRA concerns a category of commercial products that, by design, are intended to kill living organisms and thus, by their nature, are potentially harmful to the biological environment and our very lives supplies further evidence that Congress could not have intended the broad preemptive effect now endorsed by the majority. Some post -Medtronic courts agree. (Brown v. Chas. H. Lilly Co. (1999) 161 Or.App. 402 [985 P.2d 846]; Kawamata Farms v. United Agri Products, supra, 948 P.2d 1055 [negligence, strict liability and express warranty claims not preempted by FIFRA].)
Does it make sense to interpret FIFRA to preempt positive law, in the form of statutes and regulations, but not to preempt suits at common law? Given the reality that suits at common law can have an indirect regulatory effect on the labeling of products, a decision that suits at common law are not preempted by FIFRA will lead to a situation in which states may not directly regulate labeling, but may indirectly do so. This state of affairs, however, is not unlike the situation the high court recognized in Silkwood v. Kerr-McGee Corp., supra, 464 U.S. 238 (Silkwood). In that case, the Supreme Court concluded that in passing the Price-Anderson Act (Pub.L. No. 85-256 (Sept. 2, 1957) 71 Stat. 576), an amendment to the Atomic Energy Act of 1954 (codified at 42 U.S.C. § 2011 et seq.), Congress intended that, despite the federal Atomic Energy Commission’s exclusive regulatory power over safety matters in nuclear facilities, persons injured in such facilities remained free to utilize state tort remedies. “No doubt there is a tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that *351 Congress was quite willing to accept.” (Silkwood, supra, at p. 256 [104 S.Ct. at p. 625]; see also Goodyear Atomic Corp. v. Miller (1988) 486 U.S. 174, 186 [108 S.Ct. 1704, 1712, 100 L.Ed.2d 158] [in a nuclear regulatory case, “Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not”].)[3]
As in Silkwood, supra, 464 U.S. 238, it must be assumed, in the absence of a clear expression of congressional intent, that Congress intended to tolerate the tension between section 136v(b)’s grant of exclusive power to the EPA over pesticide labeling and the availability of state tort remedies that could have an indirect effect on the content of such labels.
IV
Section 136v(a) expressly affirms state regulatory power in the area of pesticides and thus suggests we should interpret FIERA’s preemptive effect narrowly. Although Cipollone, supra, 505 U.S. 504, suggested the word “requirement” be given a broad interpretation in the preemption context, the high court’s later decision in Medtronic, supra, 518 U.S. 470, revealed that such an interpretation is too simplistic. There being no clear and manifest expression of Congress’s intent in FIERA to preempt state tort law (Mortier, supra, 501 U.S. 597), and, it appearing implausible Congress intended to remove the remedies that historically have been available to compensate people for injuries caused by unreasonably dangerous commercial products, I conclude the majority’s expansive view of FIERA’s preemptive effect is erroneous. I thus respectfully dissent.
Mosk, J., concurred.

Or, in the words of plaintiffs’ interrogatory answer: “Surfactants in aqueous solution that reach certain threshold concentrations solubilize epicuticular and cuticular waxes on the surface of plant tissue, such as on the surfaces of leaves, and can be inherently phytotoxic.”

I recognize the lower federal appellate courts are largely in agreement with the majority, and I do not lightly reject their views. Nevertheless, “the decisions of the lower federal courts are persuasive but not controlling” (In re Tyrell J. (1994) 8 Cal.4th 68, 79 [32 Cal.Rptr.2d 33, 876 P.2d 519], italics added; see also People v. Bradley (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457,460 P.2d 129] [lower federal court decisions entitled to great weight but are not binding]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 942, pp. 983-984 [same]), and we have an independent constitutional obligation to interpret the federal Constitution, which, of course, includes the supremacy clause of article VI, clause 2. (See Cal. Const., art. XX, § 3 [judicial officers swear an oath to support the Constitution of the United States].) In any event, the majority of federal appellate court decisions cited by the majority predate the high court’s decision in Medtronic, supra, 518 U.S. 470, which, as explained, post, found state tort law was not preempted despite the statute’s use of the word “requirement.”

Congress later amended the law to overrule the part of the Silkwood decision that interpreted the Price-Anderson Act to permit recovery of punitive damages under state law. (See 42 U.S.C. § 2210(s); see also Nieman v. NLO, Inc. (6th Cir. 1997) 108 F.3d 1546, 1551, fn. 5.)